Submitted on record and briefs May 19, accused suspended
for two years May 28, 1970

In re Complaint as to the Conduct of
## MILTON O. BROWN, *Accused.*
469 P2d 763

Gary M. Bullock, Portland, filed the briefs for petitioner. With him on the briefs were Lent, York, Paulson & Bullock, Portland.

Martin J. Howard and Robert P. Jones, Portland, filed the brief for Oregon State Bar.

Before McAllister, Presiding Justice, and Sloan, O'Connell, Denecke, Holman, Tongue and Howell, Justices.

PER CURIAM.

The accused is charged with several counts of professional misconduct, all arising from the manner in which he handled the settlement of a personal injury case. The charges include, among others, that the accused made certain misrepresentations to hospital-creditors of his clients and that he commingled in his personal office bank account for several months the funds received by him in connection with the settlement. The accused has admitted the substance of the charges, except that he denies that he acted fraudulently and contends that he did not then realize that his conduct was wrongful.

In early 1966 the accused was engaged, on a contingent fee agreement, to represent Mrs. Helen Lange in her claim for personal injuries arising out of an accident on December 29, 1965, in which Mrs. Lange, as a pedestrian, was hit by an automobile and suffered serious injuries, resulting in some $15,600 in hospital and medical bills. The driver of the automobile carried $25,000 in insurance.

The accused filed a complaint on behalf of Mrs. Lange and the insurance company then offered to pay the full $25,000 in settlement of her claim. Mrs. Lange, however, was reluctant to enter into a settlement under which most of the proceeds would be expended for medical and hospital bills and for attorney's fees. She also felt that one of the doctors who treated her had been guilty of malpractice and that she had not re-

ceived proper care in one of the hospitals. The accused was also concerned that she might leave him and go to another attorney.

The idea was then conceived by the accused to divide the $25,000 settlement money into two parts, with $3,000 payable to Mrs. Lange in return for a covenant not to sue and with $22,000 payable to her husband for his claim of loss of consortium (which had not been filed and for which no previous demand had apparently been made), in return for a similar covenant. He admitted that one reason for this plan was to use the $3,000 settlement figure for the claim of Mrs. Lange as a means of inducing the hospitals to accept a substantially reduced pro rata payment in settlement of their bills.

A letter, dated May 22, 1966, was then prepared by the accused and signed by Mr. and Mrs. Lange, by which they instructed him not to pay "one cent" to two of the doctors from the settlement payments of $3,000 to Mrs. Lange and $22,000 to her husband because of their belief that these doctors had been guilty of malpractice and to pay to the hospitals only the balance of the $3,000 remaining after payment of attorney's fees and costs.

On the same date a letter was written by the accused to the two hospitals stating that "The case of Mrs. Lange (the only one of which the hospitals had knowledge) was resolved by her executing an agreement and covenant not to sue for the sum of $3,000; that, after payment of attorney's fees and expenses, "there is a sum of $1,810.04 to distribute" between the two hospitals in payment of their bills, with balances totaling $5,393 (after part payment by National Hospital Association, which was also entitled to be re-

imbursed from the settlement) and asking for advice how to distribute that sum between the two hospitals. In that connection he advised his clients that unless the hospitals foreclosed the liens for their bills within six months, the liens would be invalid. He also recommended that Mr. and Mrs. Lange file bankruptcy proceedings, which were later instituted by another attorney.

Meanwhile, payment was made to the accused of the settlement moneys and a portion of such funds were deposited in his personal office bank account for payment to the hospitals, in accordance with his regular practice at that time in the settlement of personal injury cases, although payment to the hospitals from that account was not made for several months. During the interim that account had overdrafts on two occasions and on several dates had balances in amounts less than the amount deposited for payment to the hospitals, although the accused may have had other funds sufficient to make these payments.

The accused did not, however, inform either hospital of the fact that the additional sum of $22,000 had been received in settlement of the claim of Mr. Lange for loss of consortium, which had never been filed and of which the hospitals apparently had no knowledge. He did, however, discuss the division of the settlement amount into payments of $3,000 and $22,000, in settlement of the two claims, with the attorney representing the insurance company, who insisted that the accused deliver to him letters under which the accused agreed to hold the insurance company and its attorney harmless from any and all liens, including "hospital liens because of payment made by you through my office without naming the hospital on the drafts."

The collection department of one of the hospitals, apparently not satisfied with the proposal by the accused, and apparently also concerned with his failure to respond to a request that the hospital lien be "honored", then made a series of frequent telephone calls to the accused and also to other persons in an effort to get information relating to the trial date for the case and other information. Most of these telephone conversations were with a girl in the office of the accused, who had been given strict instructions not to let any such calls through to him. The hospital office manager testified, however, based on her records of such calls (but not from independent memory), that on two occasions in August, 1967, she was able to talk with the accused and that she was told by him on one occasion that the "trial will not be set until October" and on the other occasion that the trial was "reset again." Meanwhile, Mrs. Lange's case had been previously dismissed without prejudice and Mr. Lange's claim had never been filed.

These conversations were denied by the accused, but he admitted that in August he began to wonder whether he should have informed the hospitals of the $22,000 payment. No such action was ever taken by the accused, however, until November, 1967, when he received demands from the attorneys representing both hospitals, who had by then learned of the $25,000 settlement and demanded that their bills be paid in full.

Even then the accused prepared letters to one of these attorneys and to the hospital represented by him, stating in both letters that the claim of Mrs. Lange had been settled for $3,000 and tendering part payment of the hospital bill. The attempted explanation of these

letters by the accused, to the effect that he delivered them personally to the attorney for the hospital with the intent to make a complete disclosure of the total amount of the settlement in a personal conversation with that attorney is hardly credible, to say the least.

Upon being confronted by the demands of the hospitals for immediate payment in full and upon being informed that they were aware of the full amount of the settlement in the sum of $25,000 and of his "hold harmless" agreement relating to the hospital liens the accused promptly paid the full amount of both hospital bills. He also cooperated completely with the Oregon State Bar in its subsequent investigation of this matter. Indeed, the commingling of the settlement funds with office funds was only discovered as the result of voluntary disclosures made by him.

In defense of his conduct it is contended by the accused, both at the time of the trial and on this appeal, that he was guilty only of an "error of judgment" in following his client's instructions and "working in his client's best interests"; although admitting that "this was a scheme to avoid paying Helen Lange's bills"; that by "hindsight" he realizes that what he did "would be probably misrepresenting to the hospitals" and was "deceitful"; that a full disclosure should have been made to the hospitals and the doctors of the total amount of the money available and that he "was wrong about it", but that at that time he "felt I was ethically, legally right". Indeed, even in his sworn answer to the complaint in this case, filed long after the accused knew of charges that his conduct was wrongful, he insisted that "there was no duty" that required him to disclose to the hospital the full facts relating to the amounts received in settlement.

It is also admitted by counsel for the accused that "commingling is, of course, a very serious offense, but he had been completely candid about it" and was "completely cooperative" with the Oregon State Bar. On this basis it is contended that the maximum penalty should be a private or public reprimand.

The trial committee of three competent attorneys, who had the advantage of observing the demeanor of the accused and all other witnesses, concluded that he was untruthful in much of his testimony and that he was guilty of devising a scheme to defraud creditors and recommended that he be permanently disbarred.

The Board of Governors, however, could not agree upon an unanimous recommendation, with one member voting for permanent disbarment, four voting for a suspension of one year and six voting for a public reprimand.

Probably the most serious elements of this case are: (1) the representation to the hospitals that Mrs. Lange's case had been settled for $3,000, without disclosing the fact that $22,000 had also been received in settlement of her husband's unfiled claim for loss of consortium, and (2) the commingling of settlement proceeds received for disbursement to the hospitals with personal funds in a personal office bank account, rather than in a separate trust account, and the withdrawing of funds from that account below the amount of such settlement proceeds, including two overdrafts.

■ Every law student, in order to be qualified to pass the examination for admission to practice law in Oregon, knows, or should know, the elementary rule of law to the effect that fraud may be committed by the concealment of material facts, as well as by affirmative misrepresentations, particularly when such con-

cealment is accompanied by misleading statements or "half truths". See *Heise v. Pilot Rock Lumber Co.*, 222 Or 78, 90, 352 P2d 1072 (1960) and numerous cases and authorities cited therein.

■ In addition, every lawyer who has practiced law for as long as the accused (since 1957) knows, or should know, that "the rule against commingling is a fundamental rule of professional conduct" and that even when the attorney involved has acted in good faith, such misconduct has been punished by suspension from practice for a period of two years. See *In re Windsor*, 231 Or 349, 350, 373 P2d 612 (1962).

Furthermore, as stated by this court *In re Pennington*, 220 Or 343, 347, 348 P2d 774 (1960):

"\* \* \* the rules of professional conduct may fill many pages; the opinions interpreting some of the rules, many volumes. But in the more basic conduct he is called upon to perform, any lawyer knows the simple rules that he must cling to: Simple straightforward honesty and absolute good faith. No less will suffice. Any person fit to be a member of the profession well knows when he has deviated from his obligations. Further exposition of this hard core of the lawyer duty would be pure embellishment."

In this case we find it hard to believe that the accused was so naive as not to realize, and from the very beginning, that what he was doing was wrong. Indeed, if he did not realize that what he was doing was wrong, it may well be contended that he is not qualified to practice law in the courts of this state for lack of professional competence, aside from active misconduct.

■ Under all of the circumstances, and considering that the charges against the accused, while serious in

nature, involve a single series of transactions, we have concluded that suspension from practice for a period of two years is the most appropriate penalty and that any lighter penalty cannot be justified, despite the recommendation of a majority of the Board of Governors of the Oregon State Bar that the penalty be limited to a public reprimand.

Accordingly, it will be the order of this court that the accused is suspended from the practice of law for a period of two years and thereafter until he shall affirmatively show that he is in all respects again able and qualified to resume his position as a member of the bar of this state and that his resumption of the practice of law will not be detrimental to the bar or to the public interest.

The Oregon State Bar is also awarded judgment against the accused for its costs and disbursements.