Argued and submitted September 8, 1997, accused disbarred March 26, reconsideration denied May 19, 1998

# In re Complaint as to the Conduct of

## MILTON O. BROWN,
*Accused.*

## (OSB 92-28; SC S43511)

956 P2d 188

Charles R. Markley, of Greene & Markley, P.C., Portland, argued the cause and filed the briefs for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.*

PER CURIAM

---

\* Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., did not participate in the consideration or decision of this case.

## PER CURIAM

In this lawyer disciplinary proceeding, the accused was charged with violating various provisions of the Code of Professional Responsibility in the course of his real estate dealings with a long-time business associate. A trial panel of the Disciplinary Board found that the accused had violated four disciplinary rules—DR 1-102(A)(3)[1] (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 7-101-(A)(3) (intentionally prejudicing client in course of professional relationship); DR 5-104(A) (business transaction with client having differing interests); and DR 5-101(A)(1) (accepting employment when lawyer's interests may impair professional judgment). The trial panel concluded that disbarment was the appropriate sanction. Pursuant to BR 10.1, that decision is subject to automatic review by this court.[2] After considering the record and the parties' arguments, we conclude that the accused violated all four of the rules that are at issue. We further conclude that disbarment is the appropriate sanction.

We find that the following facts have been proved by clear and convincing evidence:[3]

The accused joined the Oregon State Bar in 1956. In the mid-1960s, the accused met Ray Kittleson, a real estate investor and developer. Soon afterward, Kittleson and the accused began to invest in real estate projects together. Over the next 20 years, Kittleson and the accused were partners—usually equal partners—in some 55 real estate ventures. In those ventures, the two men typically played different roles: The accused would obtain financing, negotiate and structure the purchases, and perform other necessary legal work, while

---

[1] At the time of the complaint, the disciplinary rule pertaining to conduct involving dishonesty, fraud, deceit, or misrepresentation appeared at *former* DR 1-102(A)(*4*). The identical rule now appears at DR 1-102(A)(*3*) and, for the sake of convenience, we designate it as such throughout this opinion.

[2] Under BR 10.1, a trial panel's decision to disbar an accused or suspend an accused for a period of longer than 60 days "shall be reviewed by the Supreme Court."

[3] Our findings are based on the parties' factual stipulation and on other evidence that was before the trial panel.

Kittleson would identify the investment opportunity, plan development strategies, and manage day-to-day operations.

In addition to his ventures with the accused, Kittleson was involved in business dealings in which the accused had no interest. Kittleson generally had other lawyers handle the legal aspects of his individual business dealings, while relying on the accused to handle legal matters that arose in the course of his joint ventures with the accused. However, on at least a few occasions, the accused acted as Kittleson's lawyer with respect to the latter's personal and individual business dealings.

In 1983, Kittleson became interested in acquiring the Totem Pole Shopping Center in Vancouver, Washington. Kittleson had some initial discussions with the owners (with whom he was personally acquainted) and, at some point, asked the accused to review some documents in connection with those negotiations. When the accused indicated that he wanted to be part of the transaction, Kittleson readily agreed, and the accused took over the negotiations.

The accused had a particular interest in the acquisition of the Totem Pole Shopping Center that went beyond simply developing the property: He hoped to structure the purchase so that he could claim stepped-up depreciation on the entire property on his own taxes. Sometime before closing, the accused identified section 338 of the Internal Revenue Code as a general mechanism for accomplishing that goal.

It is clear from the record that the accused discussed his interest in taking stepped-up depreciation on the Totem Pole Shopping Center with Kittleson and Kittleson's wife, Patti (who was also at least nominally a part of the transaction), at some point before the closing and that the Kittlesons expressed no objections.[4] However, it also is clear that, throughout the rather extended negotiations, the Kittlesons understood that, no matter how the accused structured the transaction, they would acquire half of the property, as they had in prior ventures with the accused.

---

[4] At the time, the Kittlesons themselves had no particular need for any depreciation that the property might generate.

The Totem Pole Shopping Center was owned by the Hazel Dell Development Corporation (Hazel Dell), whose stock was entirely owned by a single family—the Potters. Before closing with the Potters, the accused activated a Washington corporation—Kittleson Development Company (KDC)—for the purpose of acquiring Hazel Dell stock. The accused prepared corporate documents for KDC that named Ray Kittleson as the sole incorporator and member of the Board of Directors. Also before closing, the accused had Kittleson open a book for subscription of KDC shares—without having Kittleson issue any of the 100 authorized shares. After setting up the corporation in the foregoing manner, the accused kept the subscription book, along with all the other KDC corporate documents, at his own office.

At closing, the purchase had been structured as follows: After KDC acquired a few shares of Hazel Dell common stock, Hazel Dell would redeem the remaining common and preferred stock from the Potter family—leaving KDC as the sole shareholder in Hazel Dell. The total purchase price would be $3.2 million, with Hazel Dell paying the Potters a $250,000 down payment at closing along with a signed promissory note for the balance.[5] The accused would loan the purchasers (KDC, Hazel Dell and, ultimately, the Kittlesons) $480,000 to cover the promissory note and the Totem Pole Shopping Center's initial operating expenses. In return for that loan, the Kittlesons would sign a demand promissory note payable to the accused in 90 days.

The transaction closed on October 1, 1984. Before that date, the accused did not provide the Kittlesons with documentation or describe to them the specifics of the transaction. In fact, when Kittleson asked for specifics, the accused put him off, claiming that the details had not been ironed out. At the closing, while the Kittlesons were engaged in signing papers relating to the Totem Pole Shopping Center purchase, the accused presented the $480,000 promissory note, payable to himself, for their signature. When the Kittlesons read the note, they were surprised that they were being asked to sign for the full $480,000. They had assumed that they would be

---

[5] The promissory note was secured by a trust deed on the shopping center and by the personal guarantees of the accused and the Kittlesons.

equal partners with the accused in the transaction and would be responsible for only half of the loan amount. They also knew, as did the accused, that they had insufficient assets to repay the loan and that the only other means of repayment—cash flow from the Totem Pole Shopping Center project—would not be sufficient. Initially, they refused to sign.

In the face of the Kittlesons' refusal, the accused became angry and verbally abusive. He pointed out that KDC was wholly owned by the Kittlesons and that the note was the only evidence that he, too, owned an interest in the Totem Pole Shopping Center project. He assured them that he only wanted the signed note to protect himself. Ray Kittleson finally agreed to sign the note, after crossing out the provision that made the entire $480,000 payable in 90 days. He did so with the apparent understanding that the accused had no intention of demanding repayment in 90 days or of acquiring full ownership of the shopping center if the Kittlesons failed to pay. Patti Kittleson refused to sign.

After the closing and the foregoing dispute, Kittleson and the accused jointly managed the Totem Pole Shopping Center according to their usual arrangement: Kittleson handled day-to-day operations, Patti Kittleson acted as bookkeeper, and the accused handled legal and financial matters. Ray Kittleson initially received no compensation for his work. Later—sometime in 1985—Kittleson began to draw $1,500 a month from revenues generated by a different property for managing all his joint property with the accused. It appears that he did so because, at that time, he had no other source of income.[6]

Beginning in November 1984, and continuing throughout much of 1985, Patti Kittleson regularly wrote checks to the accused from Totem Pole Shopping Center revenue to cover the interest on the $480,000 loan. However, the Kittlesons made no effort to repay the loan principal. Consequently, at least as far as the accused was concerned, the Kittlesons were in default as of December 1, 1984. However, the Kittlesons did not understand at that time that they were in default.

---

[6] Patti Kittleson was paid for her work as a bookkeeper.

The accused contends that he notified the Kittlesons of the fact that they were in default in late December 1984. He contends, in particular, that he drafted a letter to Alan Anderson, who did accounting work for joint projects of the accused and the Kittlesons, on December 27, 1984, to inform Anderson that the Kittlesons had defaulted and that, as a result, a corporation wholly owned by the accused (MOB Investments) had acquired KDC's Hazel Dell stock. The accused contends that he mailed the letter to Anderson on or around the time it was drafted and that a copy was also sent to the Kittlesons.

Anderson acknowledged receiving the letter, but believed that he received it long after the December 1994 date—in March 1995 at the earliest. Similarly, Ray Kittleson acknowledged that he saw the letter at some later point, but denied receiving it in December 1994. The Kittlesons contend, in fact, that the accused gave them no indication, until long after the fact, that they were in default or that Hazel Dell had passed out of their hands.

In March 1985, the accused wrote to the IRS that MOB Investments had acquired and dissolved Hazel Dell and was electing to take stepped-up depreciation on Totem Pole Shopping Center. In July 1985, the accused had Anderson file a corporate income tax return for Hazel Dell that also indicated that Hazel Dell had been dissolved into MOB Investments.

All the foregoing took place without the Kittlesons' knowledge or consent. In fact, the Kittlesons continued to act throughout this period as if they had a proprietary interest in the property. Ray Kittleson continued to devote most of his time to managing day-to-day operations, taking no compensation for his services. Patti Kittleson continued to act as bookkeeper. Both Kittlesons continued to do business in the name of Hazel Dell and held themselves out as officers of that entity. Meanwhile, the accused did nothing to disabuse them of their apparent belief in the continuing existence of Hazel Dell.

Sometime during the summer of 1985, the accused prepared and presented to Ray Kittleson certain papers that purported to document, after the fact, the Kittlesons' loan

default and the subsequent acquisition of Hazel Dell by MOB Investments. The accused asked the Kittlesons to sign the papers. They refused and later sought legal advice regarding their rights in the Totem Pole Shopping Center transaction from Wyse, a lawyer who previously had performed estate planning for the Kittlesons.

In December 1985, Wyse wrote a letter to the accused on behalf of the Kittlesons proposing a new partnership structure for the Totem Pole Shopping Center investment. The proposed structure would allow the accused to claim the depreciation on Totem Pole Shopping Center but, at the same time, give the Kittlesons an equal share in its ownership. When the accused rejected the proposal, Wyse informed the accused that the Kittlesons wished to end their business relationship with the accused.

Before the parties began their partnership dissolution negotiations, the accused took various steps to document his ownership of the Totem Pole Shopping Center. First, he prepared and recorded a trust deed on the Totem Pole Shopping Center, naming MOB Investments as the beneficiary. Later, the accused issued all the stock in KDC, which previously had been authorized but never issued, to himself. He recorded the transaction in an undated document that indicates that the stock was issued "as of October 1, 1984." In another backdated document, the accused purported to record a stockholders meeting "effective as of the 1st day of October, 1984" in which the accused and two of his employees were elected as KDC directors. Other documents reflect backdated bylaws and a "Special Meeting of Stockholders," in which the KDC Board voted to sell KDC's and Hazel Dell's stock to MOB Investments "as of January 2, 1985." Finally, in October 1986, the accused sent a letter to the Washington Secretary of State dissolving Hazel Dell "as of January 2, 1985."

Throughout much of that period, the Kittlesons continued to believe that they retained a 50 percent interest in the Totem Pole Shopping Center property. They were unaware of the trust deed or that the accused had issued the KDC stock. They had read the documents that the accused

had asked them to sign, but viewed that event as an unsuccessful attempt to cheat them out of their rightful share of the investment. It was not until sometime in 1986, when the parties were negotiating the partnership dissolution, that the Kittlesons were informed that they no longer held any proprietary interest in Totem Pole Shopping Center. Multiple litigation ensued, and the parties eventually reached a settlement in 1989.

The foregoing events first came to the attention of the Bar in 1990, when Roger Weidner, a former member of the Bar, submitted a complaint against the accused. The majority of the Weidner complaint dealt with a different matter—the accused's allegedly unlawful acquisition of certain assets from the estate of his former law partner, Donald Kettleberg. However, the complaint also included an allegation that the accused had engaged in dishonesty in connection with the Totem Pole Shopping Center venture.

In early 1991, the Bar prepared a complaint summary (which included a description of the Totem Pole Shopping Center allegation) and referred the matter to the State Professional Responsibility Board (SPRB). The SPRB, in turn, referred the matter to the Multnomah County Local Professional Responsibility Committee (LPRC). During the LPRC's investigation, the investigating lawyer received a letter from Ray Kittleson alleging various wrongdoings on the part of the accused, including allegations about the Totem Pole Shopping Center venture. The investigating lawyer immediately transmitted that letter to the Bar disciplinary counsel, explaining that its contents "relate to matters other than the Kettleberg estate and therefore are beyond the scope of my investigation."

The Bar treated the Kittleson letter as a separate complaint against the accused, and wrote to the accused asking for a response. Ultimately, the Bar assigned a new case number to the Kittleson complaint and referred *that* matter separately to the LPRC for investigation.

In the meantime, the LPRC had reported back to the Bar regarding its investigation into the Weidner complaint. On the basis of that report, Bar disciplinary counsel recommended that the SPRC dismiss the complaint in its entirety.

Of particular relevance here, counsel's memorandum to the SPRC stated:

> "As for the conflict of interest arising out of Mr. Brown's relationship with Raymond J. Kittleson, I recommend that the Board dismiss this charge also. Mr. Kittleson has filed a separate complaint which is currently in the preliminary stages [of] investigation. I feel that with Mr. Kittleson cooperating, the investigation will be more thorough and our conclusions more realistic."

On August 7, 1991, the Bar informed Weidner, the complainant, that the SPRC had reviewed a report on the matter raised by the complaint and found no violation of the Code of Professional Responsibility.

The Kittleson complaint remained in the hands of the LPRC, which investigated throughout 1992 and early 1993. In March 1993, after receiving the LPRC's report, the Bar informed the accused that it would institute a formal disciplinary proceeding against him based on the Kittleson complaint. The Bar filed a formal complaint against the accused later, in 1994, alleging violations of DR 1-102(A)(3), DR 7-101(A)(3), DR 7-102(A)(7), DR 5-104(A) and DR 5-101(A). The accused denied the alleged violations and also raised affirmative defenses based on laches, *res judicata*, and a Board of Governors policy that essentially codifies the principle of *res judicata*—BOG Policy No. 9.301(D). A hearing was held before a trial panel. The trial panel rejected the accused's affirmative defenses. As noted, the trial panel then found the accused guilty of four of the alleged violations and recommended disbarment.

■ Before we address the particular charges, it is appropriate to consider the matters raised by the accused as affirmative defenses. If applicable, those defenses—laches, *res judicata*, and BOG 9.301(D)—would preclude the Bar from prosecuting most, if not all, of the violations charged. The accused now appears to accept the trial panel's decision that his laches defense is inapplicable. He does not assign error to that ruling or otherwise argue the point to this court. We therefore concentrate on the defenses that the accused continues to assert.

Although those defenses nominally are two separate defenses, they are almost identical in substance. BOG 9.301(D) essentially codifies the principle of *res judicata* for purposes of bar disciplinary proceedings. It provides:

> "Dismissal by the State Professional Responsibility Board of a complaint or allegation of misconduct against a lawyer shall not preclude reconsideration or further proceedings on such complaint or allegation if evidence not available or submitted at the time of such dismissal justifies, in the judgment of not less than a majority of the SPRB, such reconsideration or further proceedings."

The accused argues that BOG 9.301(D) precludes the Bar from proceeding in the present case, because (1) the Weidner complaint contained an almost identical allegation pertaining to the Totem Pole Shopping Center transaction, (2) all the evidence that is being marshaled in the present proceeding was available at the time of the Weidner complaint, and (3) the Weidner complaint was dismissed without reservation.

The trial panel concluded that the BOG policy was inapplicable, because the Kittleson/Totem Pole Shopping Center allegation was never investigated or dismissed as part of the Weidner complaint. We agree with that conclusion. In that regard, the facts speak for themselves. Once Kittleson submitted his own complaint to the Bar, the inquiry into the Totem Pole Shopping Center transaction took on a life of its own. Rather than incorporating Kittleson's letter into his own examination of the Weidner complaint, the LPRC investigator forwarded the letter to the Bar, noting that it was outside the scope of his investigation. Based on that letter, the Bar opened a separate file on the Totem Pole Shopping Center transaction and eventually referred the matter to the LPRC as a separate complaint. Ultimately, when the Bar recommended dismissal of the Weidner complaint, it was with the understanding that the Kittleson/Totem Pole Shopping Center matter was being pursued separately.

The accused suggests that those facts are of little consequence in view of the fact that the SPRB dismissed the

Weidner claim, along with its allegation about the Totem Pole Shopping Center "without reservation." He asserts:

"There is nothing in the record to indicate the *SPRB* intended to collect more evidence and pursue the claims against Brown as part of another later claim. Although *disciplinary counsel's* report to the SPRB mentioned that a separate complaint was in the preliminary stages of investigation, there is no evidence in the record that the *SPRB* did anything but dismiss the claim *without reservation.*" (Emphasis in original.)

However, there also is no evidence in the record that the SPRB dismissal *was* "without reservation." The only evidence that pertains directly to the SPRB's dismissal of the Weidner complaint is a letter to Weidner explaining that the SPRB had reviewed a report on the "matter" (singular) that Weidner had brought to the Bar's attention and had found no violation of the Code of Professional Responsibility. That letter does not suggest anything about the particular terms of the dismissal, much less that the dismissal was without reservation. In fact, if there is any evidence that speaks to that question, it is that the SPRB dismissed the Weidner complaint after being informed that the Totem Pole Shopping Center matter was under separate investigation.

Finally, it is important to note that, at roughly the time of the dismissal of the Weidner complaint, the Bar and the accused were communicating back and forth about the Kittleson letter as if that letter were a separate complaint. Those communications show that, whatever the SPRB might have expressed in its letter to Mr. Weidner, the *accused* was well aware that the dismissal of the Weidner complaint did not embrace the Kittleson/Totem Pole Shopping Center transaction.

For the foregoing reasons, we agree with the trial panel that the allegations of misconduct that pertained to the Kittleson/Totem Pole Shopping Center matter were not part of the Weidner complaint for purposes of the SPRB, and were not dismissed when the SPRB dismissed that complaint.

Even if BOG Policy No. 9.301(D) could be construed to operate in the manner suggested in some circumstances—a question we do not decide[7]—those circumstances are not present here.

■ The accused's *res judicata* argument fails. Issue preclusion requires, among other things, that the issue in two separate proceedings be identical. *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 104, 862 P2d 1293 (1993). Claim preclusion requires, among other things, that the second proceeding be based on the same factual transaction that was at issue in the first. *Van de Hey v. U.S. National Bank*, 313 Or 86, 90-91, 829 P2d 695 (1992). Because the Weidner complaint investigation and dismissal did not embrace the Kittleson/Totem Pole Shopping Center transaction, neither of those elements is satisfied.

■ Having disposed of the accused's affirmative defenses, we proceed to the charges. The accused is charged, first, with violating DR 1-102(A)(3) by engaging in conduct involving fraud, deceit, misrepresentation, or dishonesty. Although all of the members of the trial panel agreed that the accused had violated that rule, they were divided with regard to whether his conduct amounted to full-fledged fraud or mere dishonesty. The majority concluded that the accused had defrauded the Kittlesons—that his

> "structuring of the Totem Pole transaction so that his company, [MOB Investments], could easily acquire the entire interest in Totem Pole * * * and his then taking the steps necessary to accomplish this purpose, without the Kittlesons' knowledge or agreement, and while making it appear superficially that the Kittlesons would and did acquire an ownership interest in Totem Pole, was deceitful."

One panel member concluded that, at the relevant time, the accused had formed no clear idea about how he was going to structure his individual transaction with the Kittlesons and, therefore, at the relevant time, lacked the requisite intent to defraud the Kittlesons. However, that member did find, by clear and convincing evidence, that Brown acted dishonestly

---

[7] The trial panel found, and we agree, that it is unnecessary in this context to decide whether BOG 9.301(D) could serve as grounds for dismissal of a complaint at the hearing stage.

in concealing vital information from the Kittlesons later, when he had chosen a course of action.[8]

In theory, if the accused's actions were dishonest, it is irrelevant whether they also were fraudulent: A lawyer can violate DR 1-102(A)(3) by engaging in either kind of conduct. However, if the accused did violate the rule, it may be important to place a specific name on the conduct, for purposes of determining the appropriate sanction. As such, we begin by considering whether the accused's conduct amounted to fraud.

"Fraud" and "deceit," as those terms are used in DR 1-1-102(A)(3), are intended in their tortious sense. *In re Hockett*, 303 Or 150, 157-58, 734 P2d 877 (1987). Generally, that means showing that (1) the accused had falsely represented a material fact; (2) the accused knew that the representation was false; (3) the misrepresentation was made with the intent to induce the recipient to act or refrain from acting; (4) the recipient justifiably relied on the misrepresentation; and (5) the recipient was damaged by that reliance. *See Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 405-06, 737 P2d 595 (1987) (setting out elements of fraud). To support an allegation of fraud, the misrepresentation need not arise out of an affirmative falsehood—active concealment also can satisfy that element. *In re Milton O. Brown*, 255 Or 628, 634-35, 469 P2d 763 (1970). Moreover (and of particular relevance here), when the parties are in a fiduciary relationship, fraud may be predicated on a simple failure to make a full and fair disclosure of the relevant facts. *Starkweather v. Shaffer*, 262 Or 198, 206 n 3, 497 P2d 358 (1972).

In this case, the Bar suggests, and we agree, that the misrepresentation at issue is of the latter sort, that is, it involves a fiduciary's failure to make a full and fair disclosure. At the outset, the accused was interested in claiming

---

[8] The trial panel majority also found that the accused deceived his accountant and the Internal Revenue Service about the nature and timing of his full ownership of the Totem Pole Shopping Center. With respect to that issue, the third member concluded that there was no fraud, because the IRS had not lost revenue or otherwise suffered damage as a result of the accused's misrepresentation. We do not consider the evidence regarding the accused's purported deception of the IRS, because the evidence that pertains directly to the Kittlesons is sufficient to establish fraud.

full stepped-up depreciation on the Totem Pole Shopping Center. He knew, even before closing, that he could not obtain that result unless he owned the Totem Pole Shopping Center in its entirety. In fact, the accused structured the Totem Pole Shopping Center transaction to take full advantage of section 338 of the Internal Revenue Code: The Kittlesons initially would receive full ownership of the property but, within 90 days, would forfeit ownership in favor of the accused.

That arrangement was a material fact in the Totem Pole Shopping Center transaction, and a full and fair disclosure necessarily would require some serious effort to give the Kittlesons a clear understanding of the arrangement and its consequences. After considering the evidence in the record, we are persuaded that the accused made no attempt to disclose the consequences of the arrangement to the Kittlesons and, in fact, took steps to keep them in the dark.

In reaching that conclusion, we necessarily accept the testimony of the Kittlesons and reject that of the accused. The accused contends that the Kittlesons always knew about "the deal"—that he would acquire full ownership of the Totem Pole Shopping Center property—and that they agreed to the arrangement because their only real interest was in the "economics" of the Totem Pole Shopping Center transaction. The accused notes that Ray Kittleson was a person of considerable business savvy and would not have entered into a transaction without understanding the details. He also notes that Kittleson conceded that he was aware of the accused's interest in depreciation and argues that Kittleson must have understood that, to obtain stepped-up depreciation, the accused would have to acquire full ownership of the Totem Pole Shopping Center. Finally, the accused suggests that the December 27, 1984, letter to Anderson, which was purportedly copied to the Kittlesons, is evidence that, at least as of December 1984, the Kittlesons understood that, having defaulted on the promissory note, they had forfeited their ownership interest in the Totem Pole Shopping Center.

We are not persuaded by those arguments. Obviously, Ray Kittleson could have had a general understanding of the requirements for depreciation and might still have

believed that the accused would arrange the transaction to preserve the Kittlesons' ownership share. In fact, we think it more than likely that, after a 20-year relationship with the accused, they would give the accused the benefit of any doubt that might arise in that regard. Finally, we are persuaded by Anderson's testimony that he believed that he received the December 27, 1984, letter months after that date and by the fact that, as the evidence shows, the accused often indulged in the practice of post-dating documents and that the Kittlesons never saw the December 27, 1984, letter until long after it purportedly was sent.

■ The Kittlesons' testimony indicates that, while they generally were aware that the accused was interested in claiming full stepped-up depreciation, they never understood that the accused had arranged to obtain full ownership of the Totem Pole Shopping Center in order to accomplish that goal. That testimony is credible and it is borne out by a number of external circumstances: (1) the fact (which was confirmed by Anderson, the accountant) that the Kittlesons truly were shocked and dismayed when they finally understood the consequences of the arrangement, (2) the fact that there is no credible contemporaneous documents that reflect the Kittlesons' agreement to the arrangement, (3) the fact that the Kittlesons continued to hold themselves out as owners of Hazel Dell long after that entity (according to the accused) had been dissolved, (4) the fact that the Kittlesons continued to work on the Totem Pole Shopping Center investment as if they were full owners, (5) the fact that Patti Kittleson continued to send interest payments on the $480,000 promissory note long after the Kittlesons supposedly had defaulted on that note, and (6) the fact that the arrangement held so little in the way of advantage for the Kittlesons that it is unlikely that a businessperson with Ray Kittleson's experience would have entered into such an arrangement.[9] To those objective

---

[9] According to the accused, the transaction had economic value to the Kittlesons because, in exchange for mere "sweat equity," Kittleson obtained a share of any profits over the payments on the master lease and an option to purchase a half interest in the property at its depreciated value after it had been paid off (or earlier, if both parties agreed). The accused concedes that there was a significant risk that the Kittlesons would not be able to realize any gain through either of those avenues but argues that, because Kittleson had no *money* invested in the venture, the arrangement was ultimately to their advantage. That argument assumes, without

facts we add the important consideration that the trial panel, which saw and heard the witnesses, believed the Kittlesons and did not believe the accused. We give weight to that assessment of credibility. *See, e.g., In re Trukositz,* 312 Or 621, 629, 825 P2d 1369 (1992) (describing and illustrating court's practice of giving weight to credibility determinations made in such cases).

■     Ultimately, then, we find by clear and convincing evidence that the accused failed to make a full and fair disclosure to the Kittlesons with respect to his plan to obtain full ownership of the Totem Pole Shopping Center property. If that failure occurred in the context of a fiduciary relationship, the accused's material misrepresentation of fact constituted fraud. We turn to the question whether such a relationship existed.

The Bar contends that such a relationship did exist—not only because the accused and Kittleson stood in a lawyer-client relationship, but also because they were joint venturers in the Totem Pole Shopping Center project. *See, e.g., Starr v. International Realty,* 271 Or 396, 402-03, 533 P2d 165 (1975) (describing fiduciary relationship between joint venturers). The accused denies a lawyer-client relationship and also contends that, because the Bar did not plead or argue a joint-venturer relationship before the trial panel, it cannot rely on that relationship in this context. Because we conclude that a lawyer-client relationship *did* exist between the accused and the Kittlesons, we need not and do not consider the latter point.

The accused concedes that, to the extent that his relationship with Kittleson can be characterized as a partnership, he generally acted as legal counsel to the partnership—and did so in the Totem Pole Shopping Center venture. He argues, however, that his legal representation of the *partnership* should not be confused with legal representation of the Kittlesons as individuals. In that regard, he notes that, although the issue has never been decided in Oregon, the majority rule among jurisdictions that *have* considered the

justification, that the Kittlesons placed little or no value on their own labor. We are not persuaded.

issue is that representation of a partnership is *not*, as a matter of law, representation of any or all of the individual partners. *See* Ronald E. Mallen & Jeffrey M. Smith, 3 *Legal Malpractice* § 24.8 (4th ed 1996) (citing and comparing cases).

■ We agree that the mere fact that a lawyer represents a partnership does not *ipso facto* make that lawyer the legal counsel to the individual members of the partnership or create a fiduciary relationship that flows to those individuals. On the other hand, we are persuaded that, in some circumstances, representation of the partnership will be a relevant consideration in determining whether a lawyer-client relationship exists. That is particularly true when, as here, the partnership is a small one and the partnership lawyer is himself a partner. In such circumstances, it may be reasonable for other partners to assume that the lawyer's/partner's representation flows to them as individuals.

In *In re Weidner*, 310 Or 757, 770, 801 P2d 828 (1990), this court noted that a lawyer-client relationship may arise out of a would-be client's reasonable belief that such a relationship exists, if that belief is accompanied by evidence showing "that the lawyer understood or should have understood that the relationship existed, or acted as though the lawyer was providing professional assistance or advice on behalf of the putative client." *See also In re Bristow*, 301 Or 194, 201-02, 721 P3d 437 (1986) (illustrating proposition).

Here, Ray Kittleson testified that, as far as he was concerned, the accused was acting as *his* lawyer in the Totem Pole Shopping Center transaction. In view of the fact that the accused routinely took care of all the legal aspects of the partnership's activities, that he and the Kittlesons were the sole venturers in the Totem Pole Shopping Center venture, that he had, at times, represented the Kittlesons in individual matters, and that the Kittlesons had relied on his legal expertise and advice over the course of a long personal and business relationship, that belief was reasonable. Finally, even if the accused did not intend to act as the Kittlesons' lawyer, he should have been aware that, in the circumstances, his actions—conducting the negotiations for purchase of the Totem Pole Shopping Center, reviewing and drafting the legal documents relating to the transaction, keeping the KDC

corporate books, and declining to discuss the details of the Totem Pole Shopping Center transaction with the Kittlesons before closing (all in the context of a partnership with them) would induce a reasonable expectation on the Kittlesons' part that he was representing them in the Totem Pole Shopping Center transaction.

It appears, moreover, that that lawyer-client relationship continued until the accused asked the Kittlesons to sign backdated papers documenting the demise of Hazel Dell and the change in ownership of the Totem Pole Shopping Center. It was not until that event that the Kittlesons recognized that the accused might not be using his expertise in an even-handed manner and that they should seek separate counsel.

The accused contends that the evidence does not support such a conclusion, because Ray Kittleson was sophisticated in real estate matters and did not rely on the accused's expertise or advice. He points out that Kittleson admitted to having used other lawyers in the course of his business relationship with the accused and that one of those lawyers even had advised Kittleson specifically about his business relationship with the accused. The accused also argues that, regardless of what went on beforehand, the blowup over the accused's demand that the Kittlesons sign a $480,000 promissory note would have ended any illusion on the Kittlesons' part that the accused was representing their interests.

We disagree with the assumptions that are implicit in the accused's argument. Lawyer-client relationships are not exclusive, and the fact that the Kittlesons retained other lawyers in their various business and personal dealings does not preclude a lawyer-client relationship between the Kittlesons and the accused. Even the fact that Ray Kittleson had received advice from another lawyer regarding the partnership does not negate such a relationship—particularly when (as Kittleson described it) the advice was an unsolicited outgrowth of a matter unrelated to the partnership and was never followed.[10] Finally, there is no reason to believe that

---

[10] Kittleson conceded that lawyer Wyse had advised him, even before the T ~~m~~ Pole Shopping Center transaction closed, that he and the accused should

the blowup over the promissory note changed the relationship—at least with respect to Ray Kittleson.[11] If anything, the fact that Ray Kittleson signed the note, after the accused offered his assurances, suggests that Kittleson continued to believe that the accused was acting in a manner consistent with the Kittlesons' interests.

Ultimately, we find by clear and convincing evidence that the accused stood in a lawyer-client relationship—a fiduciary relationship—with the Kittlesons. With respect to the Totem Pole Shopping Center venture, that relationship began in 1983, when the accused took over the negotiations for the purchase, and continued until mid-1985, when the Kittlesons realized that the accused's interests in the Totem Pole Shopping Center transaction might be adverse to theirs and sought separate counsel. Because of that relationship, the accused had a duty to make full and fair disclosure to his clients, the Kittlesons. He flouted that duty when he failed to inform the Kittlesons about the particulars of his plan to obtain full ownership of the Totem Pole Shopping Center, thereby fulfilling the first element of a claim of fraud—that the accused misrepresented a material fact.

With respect to the requirement that the accused knew that his representations were false, it is clear that the accused fully understood that the Kittlesons expected a different arrangement—that they believed that the accused would structure the transaction to provide them with at least a 50 percent ownership interest in the Totem Pole Shopping Center. The accused had to know that that always had been the arrangement in the past and that, in the absence of some indication that he intended to do otherwise, the Kittlesons would expect the same in the Totem Pole Shopping Center venture. If nothing else, the fact that the Kittlesons objected to signing the promissory note would have alerted the accused as to the nature of their misunderstanding.

---

have a written partnership agreement. Kittleson indicated, however, that he was consulting Wyse about estate planning matters and that he never sought advice about his relationship with the accused until much later.

[11] Patti Kittleson's testimony suggests that she may have ceased to rely on the accused's professional advice at the time of that incident.

That brings us to the third element of a fraud claim—the requirement that the misrepresentation be made with the intent of inducing the hearer to act or refrain from acting in some particular way. As noted, the trial panel was divided on the issue of whether that intent element had been proved by clear and convincing evidence. The majority concluded that the accused had acted with the purpose of inducing the Kittlesons' participation in the initial transaction and their continued participation in managing the Totem Pole Shopping Center. The dissent concluded that the accused's actions before and at the time of the closing with the Potters merely were designed to keep his options open and that the accused had no clear intent to misrepresent matters until after the damage had been done.

We agree with the trial panel majority that the accused misrepresented the structure of the Totem Pole Shopping Center transaction in order to induce reliance on the part of the Kittlesons. It is clear from the record that, throughout the Totem Pole Shopping Center negotiations and thereafter, the accused's primary goal was to obtain full ownership of the Totem Pole Shopping Center for depreciation purposes. It also is clear that, to accomplish that goal, the Kittlesons had to be on board. The accused knew that the Kittlesons expected a 50 percent ownership interest in the project (that is how previous ventures with the accused had been structured) and that they probably would not agree to the transaction if it did not involve an ownership interest for them. Yet, knowing all along that the Kittlesons' nominal ownership interest in the Totem Pole Shopping Center was illusory and fleeting, the accused nevertheless allowed the Kittlesons to believe that they were getting what they wanted out of the transaction. He did so for the obvious purpose of obtaining their participation.

In addition, we find clear and convincing evidence of an intent to deceive based on the accused's assurances to the Kittlesons, when they balked at signing the $480,000 promissory note, that the only purpose of the note was to protect himself.[12] The only possible reason for offering such assurances under those circumstances would be to induce the Kittlesons to sign.

---

[12] In regard to those assurances, we find the following testimony of Ray Kittleson to be credible:

The final elements of a fraud claim, justifiable reliance and damage, also are proved by clear and convincing evidence. There can be no question that the Kittlesons entered into the Totem Pole Shopping Center transaction and, later, continued to work on the venture, because they relied on the accused's representation (or his failure to disabuse them of their misunderstanding) that they were obtaining an ownership interest in the property. There also is no question that the Kittlesons were damaged by that reliance. They were denied any meaningful interest in a business opportunity that they had identified.

In summary, we find by clear and convincing evidence that the accused engaged in conduct involving fraud. In doing so, the accused violated DR 1-102(A)(3).

Having established a violation of that disciplinary rule, we turn to the three rules that remain. For the reasons that follow, we agree with the trial panel that the accused violated each of those rules in the course of the Totem Pole Shopping Center venture.

We begin with DR 7-101(A)(3), which provides that, except in circumstances that are inapplicable in the present case, a lawyer shall not intentionally prejudice or damage the lawyer's client in the course of the professional relationship. It already has been established that the accused was in a lawyer-client relationship with the Kittlesons with respect to the Totem Pole Shopping Center venture. We, therefore, are left to consider whether there is clear and convincing evidence that the accused intended to prejudice or damage the Kittlesons in the course of that relationship.

There is. The record shows that the accused intentionally took steps to acquire full ownership of the Totem Pole Shopping Center without disclosing his actions or intentions to the Kittlesons. In taking those actions, he necessarily intended to deprive the Kittlesons of any ownership share in a business opportunity that they initially had identified.

---

"Q: When you signed that note out in the parking lot on October 1st, 1984, did you have an understanding that [a foreclosure] could result if you didn't pay it in 90 days?

"A: No. The understanding was that he had to have some indication in case we got killed that he had an ownership in Totem Pole Plaza. That was his statement to us, I need to prove that I am the owner in there, part owner."

That deprivation was contrary to the Kittlesons' clear expectations and was, consequently, prejudicial. In short, we find by clear and convincing evidence that the accused violated DR 7-101(A)(3).

■ The next rule that is at issue, DR 5-104(A), provides that a lawyer

"shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise the lawyer's professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

There is clear and convincing evidence that, in his Totem Pole Shopping Center dealings, the accused also violated that rule. That the accused was acting as the Kittlesons' lawyer in the Totem Pole Shopping Center matter is, at this point, a given. Our previous findings demonstrate, moreover, that the Kittlesons expected the accused to exercise his professional judgment for their protection or benefit and that the accused knew that he and the Kittlesons had differing interests in the Totem Pole Shopping Center transaction (the accused's interest in full ownership of the Totem Pole Shopping Center for purposes of stepped-up depreciation was clearly incompatible with the Kittlesons' desire and expectation that they would share equally in ownership of the Totem Pole Shopping Center and the income generated thereby).

■ The final disciplinary rule that is at issue in this case also pertains to failure to obtain consent from a client when there is a potential conflict of interest. DR 5-101(A)(1) provides that:

"Except with the consent of his client after full disclosure,

"(1) a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will or reasonably may be affected by his own financial, business, property, or personal interests."

Our analysis with respect to that rule is similar to our analysis in regard to DR 5-104(A). We find that the accused knew that he had a business interest in the Totem Pole Shopping Center venture that was different from, and adverse to, the

Kittlesons' interests. We also find that he knew or should have known that that interest was of a sort that was likely to affect his professional judgment on the Kittlesons behalf. In those circumstances, the accused should not have negotiated the Totem Pole Shopping Center purchase (or otherwise purported to represent the Kittlesons' interests in the venture) without first fully disclosing to the Kittlesons that his own interests might affect his professional judgment. In carrying on without obtaining the Kittlesons' consent after full disclosure, the accused violated DR 5-101(A)(1).

█ We have concluded that the accused violated four separate disciplinary rules in the course of his business dealings with his clients, the Kittlesons. In determining the proper sanction for those violations, we look to the *ABA Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (the ABA Standards) and our case law. *In re Jeffery*, 321 Or 360, 374, 898 P2d 752 (1995). The ABA Standards recommend consideration of four factors: (1) the duty violated; (2) the lawyer's mental state; (3) the potential or actual injury resulting from the misconduct; and (4) any aggravating or mitigating factors. ABA Standard 3.0.

By participating in the Totem Pole Shopping Center transaction in the manner described, the accused violated the duty of candor that he owed to his clients, the Kittlesons. He also violated his duty, also owed to his clients, to avoid conflicts of interest. In doing so, he deprived his clients of their expectation in a business opportunity and caused them to waste almost two years operating and managing a project when that project held no real advantage for them. In short, the accused's actions resulted in real harm to the Kittlesons, who were looking to him as their lawyer to protect their interests.

With respect to his violation of DR 1-102(A)(3), the accused's conduct was intentional—he intentionally deceived the Kittlesons in order to obtain a benefit to himself. His conduct with respect to DR 7-101(A)(3) also was intentional. With respect to the remaining violations, his conduct was knowing.

Under the ABA Standards, disbarment is the appropriate sanction whenever a lawyer intentionally abuses the

lawyer-client relationship for his own benefit. ABA Standard 4.61. Thus, without regard to mitigating or aggravating factors, the ABA recommends disbarment when (1) a lawyer intentionally deceives a client in order to benefit himself and the deception causes serious or potentially serious injury to a client, ABA Standard 4.61; or (2) engages in representation of a client knowing that his interests are adverse to the client's, if the lawyer causes serious injury thereby and does so with the intent of benefiting himself, ABA Standard 4.31. Our case law is consistent with those general themes. *See, e.g., In re Barber*, 322 Or 194, 904 P2d 620 (1995) (lawyer who misrepresented his time and expenses in a fee dispute was disbarred); *In re Morin*, 319 Or 547, 878 P2d 393 (1994) (lawyer disbarred for falsely notarizing will signatures to increase profits).

The trial panel found, and we agree, that there are no mitigating factors in this case. We also agree with at least some of the aggravating factors that the trial panel identified. In particular, we note that the accused never has acknowledged the wrongful nature of his conduct, and that the accused has been disciplined for ethical violations, also involving deceitful conduct, in the past. ABA Standards 9.22(a) and (g); *Brown*.

In view of the seriousness of the violations at issue in this case, the presence of aggravating factors, and the absence of any mitigating factors, we conclude that the appropriate remedy is disbarment.

The accused is disbarred.