Argued and submitted January 5, 1998, accused suspended from the practice of law for two years May 27, 1999

## In re Complaint as to the Conduct of

## BRUCE E. HUFFMAN,
*Accused.*

## (OSB 94-187; SC S43743)

983 P2d 534

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.*

PER CURIAM

---

* Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision.

## PER CURIAM

The Oregon State Bar (Bar) filed a disciplinary complaint against the accused, stating three causes of complaint. The first cause alleged that the accused obtained default judgments against a former client regarding unpaid attorney fees and costs, refused to set aside the judgments after notice of the client's bankruptcy, and disclosed client confidences or secrets in a letter dated December 10, 1993, to the client's new attorney. The Bar alleged that the accused's conduct, described in the first cause of complaint, violated Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(4) (prohibiting conduct prejudicial to the administration of justice), DR 7-102(A)(1) (prohibiting a lawyer from taking legal action if the lawyer knows or when it is obvious that such action merely would serve to harass or maliciously injure another), and DR 7-102(A)(2) (prohibiting a lawyer from knowingly advancing an unwarranted claim or defense). The second cause of complaint alleged that the accused's December 10, 1993, letter threatened to present criminal charges to obtain an advantage in a civil matter in violation of DR 7-105(A) (a lawyer may not threaten to press criminal charges to obtain advantage in a civil matter). The third cause of complaint alleged that, by sending the December 10, 1993, letter and in testifying at a hearing regarding his default judgments, the accused knowingly revealed client confidences or secrets, or used client confidences or secrets to the disadvantage of his client or for his own advantage, in violation of DR 4-101(B) (a lawyer may not knowingly reveal or misuse client confidences or secrets).

A trial panel of the Disciplinary Board sustained the second and third causes of complaint, concluding that the accused had violated DR 7-105(A) and DR 4-101(B). The panel imposed a 120-day suspension. Our review of that sanction is automatic. ORS 9.536(2) (1995) (Supreme Court shall review matters in which panel imposes a suspension of longer than 60 days).[1]

---

[1] ORS 9.536(2) now provides for automatic review by this court of lawyer discipline proceedings if the accused is disbarred or suspended for a period longer than six months. That change applies only to trial panel decisions filed on or after October 4, 1997. Or Laws 1997, ch 149, § 2. The trial panel decision here was filed before that date.

■■ This court reviews the record *de novo*. ORS 9.536(2) and (3); BR 10.6. The Bar has the burden of establishing alleged misconduct by clear and convincing evidence. BR 5.2. As did the trial panel, we sustain the second and third causes of complaint and conclude that the accused violated DR 7-105(A) and DR 4-101(B). We suspend the accused for two years, commencing 60 days from the date of filing of this decision.

We find the following facts. The accused was licensed to practice law in Oregon in 1980. He practiced law primarily in the Klamath Falls area. The accused represented DeMendoza in various legal matters, including a property transaction, a personal injury claim, a tax dispute, and a case in which government agents seized guns owned by DeMendoza. On August 22, 1990, during their ongoing lawyer-client relationship, the accused and DeMendoza entered into a written retainer agreement relating to an unspecified criminal matter. The accused worked on that matter and periodically billed DeMendoza. On May 2, 1991, the accused sent DeMendoza a letter indicating that, if his bill were not paid, the accused would file an action to collect his fee. DeMendoza did not pay the bill. The accused did not file an action but continued performing legal work for DeMendoza.

As of September 1, 1991, DeMendoza owed the accused $1,276.82. The accused informed DeMendoza that he would withdraw and sue if the bill were not paid by September 5. DeMendoza again failed to pay. The accused again did not withdraw or sue, but continued to perform legal work for DeMendoza for several months. By December 1991, when the accused stopped working on the matter, the total amount owed by DeMendoza, including interest, was approximately $1,700.

On October 10, 1990, DeMendoza transferred to his cousin, Javier Mendoza (Javier), a rental house in Klamath County in exchange for "love and affection." In February 1992, DeMendoza sold another piece of property for approximately $157,000 (the Wilderness Ranch sale).

In April 1992, DeMendoza filed a Chapter 7 bankruptcy petition in the U.S. Bankruptcy Court for the Northern District of California. The petition listed the

accused as an unsecured creditor with a claim of $1,920. It is undisputed that that claim arose out of the August 1990 retainer agreement between the accused and DeMendoza. On April 16, 1992, the clerk of the bankruptcy court mailed to the accused, at his then-current address, a notice of commencement of bankruptcy proceedings.[2] The notice stated:

> "If a creditor believes that the debtor should not receive any discharge of debts under section 727 of the Bankruptcy Code[3] or that a debt owed to the creditor is not dischargeable under section 523(a)(2), (4), or (6) of the Bankruptcy Code,[4] timely action must be taken in the bankruptcy court by the deadline set forth above * * *."

---

[2] The accused moved from that address on or about March 1, 1993.

[3] 11 USC § 727 provides, in part:

"(a) The court shall grant the debtor a discharge, unless—

"* * * * *

"(2) the debtor, with intent to hinder, delay, or defraud a creditor * * *, has transferred, removed, destroyed, mutilated, or concealed * * * —

"(A) property of the debtor, within one year before the date of the filing of the petition * * *

"* * * * *

"(4) the debtor knowingly and fraudulently, in or in connection with the case—

"* * * * *

"(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; * * *

"* * * * *

"(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if—

"(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

"* * * * *

"(e) The trustee, a creditor, or the United States trustee may request a revocation of a discharge—

"(1) under subsection (d)(1) of this section within one year after such discharge is granted[.]"

[4] 11 USC § 523(a) provides, in part:

"A discharge under section 727 * * * of this title does not discharge an individual debtor from any debt—

"* * * * *

"(2) for money, property, services * * * to the extent obtained by—

"(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The deadline for objecting to discharge of the debtor or for determining the dischargeability of certain types of debts was July 13, 1992.

On August 14, 1992, the clerk of the bankruptcy court mailed to the accused, at his then-current address, a notice of discharge of debtor. The notice stated the following orders of the bankruptcy court:

"1.    The above-named debtor is released from all dischargeable debts.

"2.    Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the debtor with respect to any of the following:

   "(a)   debts dischargeable under 11 U.S.C. sec. 523;

   "(b)   unless heretofore or hereafter determined by order of this court to be nondischargeable, debts alleged to be excepted from discharge under clauses (2), (4) and (6) of 11 U.S.C. sec 523 (a);

   "(c)   debts determined by this court to be discharged.

"3.    All creditors whose debts are discharged by this order and all creditors whose judgments are declared null and void by paragraph 2 above are enjoined from instituting or continuing any action or employing any process or engaging in any act to collect such debts as personal liabilities of the above-named debtor."

In February 1993, the accused filed a complaint against DeMendoza in Klamath County Circuit Court (case number 9300538CV) alleging fraud, conversion, and breach of contract. All claims were based on the unpaid debt for fees incurred under the August 1990 retainer agreement. The accused alleged that, with accrued interest, the amount owed

---

"* * * * *

"(4)   for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

"* * * * *

"(6)   for willful and malicious injury by the debtor to another entity or the property of another entity[.]"

at that time was $2,080.01. In the fraud claim, the accused alleged that DeMendoza had promised to pay him out of the proceeds of the Wilderness Ranch sale and that that representation was false and was undertaken with the intent to cause the accused to refrain from collecting his legal fees. In the conversion claim, the accused alleged that DeMendoza had converted the Wilderness Ranch sale proceeds to his own benefit, despite his promise to pay the accused's fee from those proceeds. In the breach-of-contract claim, the accused alleged that DeMendoza had breached the retainer agreement. In addition to actual damages with interest, attorney fees, and costs, the accused sought $7,500 in punitive damages.

The accused filed a motion seeking authorization to serve DeMendoza with a summons and complaint by mailing them to his last known address and posting them at the Klamath County Courthouse. The court granted the motion, and the accused employed those service methods. DeMendoza did not respond to the complaint and, on March 31, 1993, the accused obtained a default judgment against DeMendoza for $11,355.71 ($9,580.01 in damages, $1,660 in attorney fees, and $115.70 in costs).

In April 1993, the accused filed a complaint against DeMendoza and Javier (case number 9301365CV), alleging that DeMendoza had transferred the rental property in October 1990 to Javier with the fraudulent intent to avoid the debt for attorney fees to the accused. The accused alleged that the property was worth $70,000 and sought the following relief: a declaration that the property transfer to Javier was void; a money judgment for the amount of the judgment obtained in case number 9300538CV or for the value of the property, whichever was less; a sale of the property, with proceeds of the sale to be applied to the judgment that the accused had obtained in case number 9300538CV; and attorney fees and costs.

Again, the accused sought, and the court granted, authorization to serve the defendants by mailing a summons and complaint to DeMendoza's last known address and posting at the Klamath County Courthouse. The accused employed those service methods. The defendants did not

respond to the complaint and, on June 3, 1993, the accused obtained a default judgment for $13,448.71 ($11,355.71 from the judgment in case number 9300538CV, $1,940 in attorney fees, and $153 in costs). The accused also obtained an order declaring the transfer from DeMendoza to Javier void and directing that the property be sold and the proceeds applied to the accused's judgment. On July 20, 1993, the property was sold at a sheriff's sale for $13,850. All but $6.81 of the proceeds were paid to the accused to satisfy the judgment in case number 9301365CV and to reimburse costs related to the sheriff's sale.

DeMendoza attempted to stop the sheriff's sale by contacting the Klamath County District Attorney's office, but he was unsuccessful. DeMendoza and Javier then retained a new lawyer, Gilstrap. In October or November 1993, the accused and Gilstrap had a telephone conversation in which the accused claimed that he had no prior notice of DeMendoza's bankruptcy proceeding. On November 15, 1993, Gilstrap sent the accused a letter requesting that the accused explain why he had pursued claims against DeMendoza after the bankruptcy court had discharged DeMendoza's debt. In a second letter, dated December 2, 1993, Gilstrap indicated that his clients intended to set aside the accused's judgments and to file a civil complaint against the accused for abuse of process. Gilstrap also indicated that those proceedings might be unnecessary if the accused would agree to invalidate the judgments and enter into a money settlement with his clients.

The accused responded with the following letter to Gilstrap dated December 10, 1993:

"The reason I called your office was because you sent your first letter to the wrong address. It also appears it got miss delivered [sic]. In any event I did not get notice of any bankruptcy filing on [DeMendoza's] behalf. I have had problems with mail delivery at my old address and there are many witnesses to that. As for your revelation that [DeMendoza] filed bankruptcy, [it] surprised and shocked me. The reason for that is [DeMendoza] is not bankrupt. You might want to ask him about the $157,000 he received from [the Wilderness Ranch sale] a month before he filed bankruptcy. This does [not] even begin to cover numerous other personal

property assets and his real estate holdings in Mexico and Klamath Falls. I would be willing to bet that he did not list those assets. I am requesting that you obtain a complete copy of his bankruptcy filing including all schedules and send it to me within 10 days or I will request directly from the Trustee. If the filing fails to include those assets I will be contacting the US Attorney and the bankruptcy Court. If he did not list all his assets he has perpetrated a fraud upon the Court which I believe makes the discharge void not to mention the criminal sanctions he is subject to. Also you might want to ask him about the cache of guns he owns some of which are listed with ATF. If [DeMendoza] has any thoughts about back dating documents to show transfers, you can tell him not to bother.

"The amount of knowledge I have about the bankruptcy law you could fit on the head of a pin, but I do know that intentional torts, fraud etc. are not discharg[e]able in bankruptcy. Also [Javier] conspired with [DeMendoza] to defraud creditors. I don't suppose your clients have told the other creditors including the IRS that fact.

"* * * You might want to take a look at the ethics rules yourself and determine if you should turn yourself in. Also, this applys [sic] to you and the bankruptcy attorney, a lawyer may not conceal assets and once has info[rmation] that a client commit[t]ed fraud has a duty to disclose that info[rmation]. DR 7-102(B). Continued actions by you or the bankruptcy attorney could be deemed furtherance of the conspiracy. * * *

"I have also learned that [DeMendoza] has perpetrated a fraud upon the Circuit Court in Klamath Co. in his divorce. You may want to counsel him in that matter also. Again in the bankruptcy case [DeMendoza] filed it in San Jose, Ca. and stated he was a resident there. This is false. Not only has he perpetrated another fraud upon the Court but there is no jurisdiction to file it there. That makes any discharge Order void. I must insist that he dismiss the bankruptcy within 10 days to remedy that false statement. Again he is subject to criminal sanctions for that.

"After looking at the creditors list I see [DeMendoza] has defrauded the United States government, IRS, Calif. Franchise Tax Board, and other numerous creditors many of which are located in Klamath Falls. His character will be

an issue in any court proceeding. The reason he left Klamath Falls was because of the many people he screwed over and the many enemies he created. Many of the people he thinks are his 'friends' have contacted me to relate how he takes advantage of people. He has also rubbed the powers to [*sic*] be the wrong way and they would love to see him set foot in Klamath Co. Ask him about his jury tampering charges. Ask him about the time he forged my name and another attorney's name to a settlement check so he could cash the check. The bottom line is that I relish the chance to get [DeMendoza] in Court.

"* * * * *

"I am not going to show you all my cards. I like to leave a few surprises later for Court. I am livid that your clients make these accusations knowing full well that they are the guilty parties. Before your clients start screwing with someone's livelihood they had better get their facts straight and come into Court with clean hands. If you and your clients cannot understand my anger then you do not have the cerebral mass of a gnat's ass."

In December 1993, Gilstrap filed motions to vacate the judgments in both case number 9300538CV and case number 9301365CV under ORCP 71 B on several grounds, including that the debt that formed the basis of the claims in both cases had been discharged in bankruptcy before the accused had filed his complaints. The accused attached a copy of his December 10, 1993, letter to his opposition to those motions. In February 1994, the court granted the motions and entered amended judgments of dismissal in favor of DeMendoza and Javier.[5]

We first address the Bar's allegation, in its second cause of complaint, that, by sending the December 10, 1993, letter, the accused violated DR 7-105(A), which provides:

---

[5] The accused appealed the amended judgments to the Court of Appeals. That court concluded that the trial court had not erred in setting aside the default judgment against Javier, because he had not been properly served with the summons and complaint and, therefore, the court lacked personal jurisdiction over him. *Huffman v. Leon De Mendoza*, 135 Or App 680, 686, 899 P2d 734 (1995), *rev den* 322 Or 489 (1996). The court further stated that the accused had conceded that the judgments were void as to DeMendoza because of the bankruptcy discharge. *Id.* at 684. The accused disputes that he so conceded. *See* 328 Or at 585 n 9.

"Except as provided below, a lawyer shall not threaten to present criminal charges to obtain an advantage in a civil matter. A lawyer may threaten to present such charges if, but only if, the lawyer reasonably believes the charge to be true and if the purpose of the lawyer is to compel or induce the person threatened to take reasonable action to make good the wrong which is the subject of the charge."

The Bar contends that, by sending the December 10, 1993, letter to Gilstrap in connection with DeMendoza's motion to set aside the judgments, the accused threatened to cause criminal charges to be instituted against DeMendoza if he tried to have the judgments set aside.

The accused offers several responses. First, he argues that he did not intend the December 10, 1993, letter as a threat and, for that reason, he cannot be held to have violated the rule. Second, he argues that his conduct falls within the exception in the second sentence of DR 7-105(A). That is, he contends that he "sought to induce [DeMendoza] to right the wrong and list those assets and/or dismiss the bankruptcy." Third, he contends that, because DeMendoza did not understand the letter as presenting any threats, there was no threat for the purposes of DR 7-105(A). Finally, he argues that, because he sent the letter to Gilstrap, and not directly to DeMendoza, DeMendoza could not have been deterred by the letter from pursuing his position in the civil actions.

In *In re McCurdy*, 297 Or 217, 220, 681 P2d 131 (1984), this court held that "DR 7-105(A) requires evidence of a specific intent to threaten to present criminal charges to obtain an advantage in a civil matter." In ascertaining whether the accused intended to threaten to press criminal charges against DeMendoza, the best evidence of his intent is the December 10, 1993, letter itself. In the letter, the accused expressed a definite intent to press criminal charges if DeMendoza failed to set aside the bankruptcy. The accused referred to several assets that he claimed that DeMendoza owned and requested a copy of the complete list of the assets that DeMendoza listed in his bankruptcy petition. The letter stated:

"If the filing fails to include those assets *I will be contacting the US Attorney* and the bankruptcy Court. If he did not list

all his assets he has perpetrated a fraud upon the Court which I believe makes the discharge void *not to mention the criminal sanctions he is subject to.*"

(Emphasis added.) Additionally, the accused asserted that DeMendoza had not lived in the Northern District of California long enough to file for bankruptcy there. Referring to that assertion, the letter stated:

"I must insist that he dismiss the bankruptcy within 10 days to remedy that false statement. Again he is subject to criminal sanctions for that."

Those excerpts convey the message that, unless DeMendoza dismissed the bankruptcy proceeding, the accused would contact law enforcement officials to inform them of the asserted criminal wrongdoing by DeMendoza. The accused admitted in the letter that he did not know whether DeMendoza had failed to list the assets to which the accused referred in the bankruptcy petition. In sum, we conclude that the accused intended the letter to convey a threat to press criminal charges.

■ We reject the arguments asserted by the accused. Because the accused did not know whether DeMendoza's bankruptcy petition was false or incomplete, and consequently had no reasonable belief that DeMendoza had committed a crime, the accused may not rely on the exception stated in the second sentence of DR 7-105(A). Finally, under the circumstances, DeMendoza's subjective response to the letter, and the fact that the accused sent the letter to Gilstrap rather than DeMendoza, are not relevant.

We conclude that the Bar has established by clear and convincing evidence, on the second cause of complaint, that the accused threatened to press criminal charges to obtain an advantage in a civil matter. Accordingly, we find that the accused violated DR 7-105(A). *See In re Lewelling*, 296 Or 702, 706, 678 P2d 1229 (1984) (where lawyer stated that he would advise his client to go to grand jury if adverse party in litigation did not pay money sought in civil action, lawyer violated DR 7-105(A)).

■ In its third cause of complaint, the Bar charged that the accused violated DR 4-101(B), which provides, in part:

"(B)    Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

"(1)    Reveal a confidence or secret of the lawyer's client.

"(2)    Use a confidence or secret of the lawyer's client to the disadvantage of the client.

"(3)    Use a confidence or secret of the lawyer's client for the advantage of the lawyer * * *.

"(C)    A lawyer may reveal:

"* * * * *

"(4)    Confidences or secrets necessary to establish a claim or defense on behalf of a lawyer in a controversy between the lawyer and the client * * *."

DR 4-101(A) defines "confidence" and "secret" as follows:

"(A)    'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in a current or former professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

The Bar contends that, in his December 10, 1993, letter, the accused revealed several confidences or secrets of DeMendoza, including information about DeMendoza's assets, such as the proceeds that he received from the sale of the ranch and his gun collection, and about his divorce and his possible participation in tax fraud, jury tampering, and forgery.

In response, the accused argues that: he did not obtain the information that he disclosed through his representation of DeMendoza; the Bar failed to prove that he had disclosed a confidence or secret, because it failed to call DeMendoza to testify; during a deposition, DeMendoza could not identify a single confidence or secret contained in the letter; DeMendoza never requested that the accused maintain confidentiality about any of the matters disclosed in the letter; and the accused's disclosure falls under the exception in DR 4-101(C)(4) that allows lawyers to disclose confidences or secrets to prove a claim or defense in a dispute with the client.

■ Although the ethical obligations to maintain client confidences and client secrets are not identical, *State v. Keenan / Waller*, 307 Or 515, 519, 771 P2d 244 (1989), a lawyer's improper disclosure of either confidences or secrets is sufficient to support a violation of DR 4-101(B). Because, as explained below, we determine that the accused disclosed client secrets without lawful justification, we do not address whether he also disclosed client confidences.

■ As noted, DR 4-101(A) defines a "secret" as:

"other information gained in a current or former professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

For information to be a "secret," the lawyer must have acquired it through a current or former professional relationship with the client.

The accused testified that all the information about DeMendoza disclosed in the December 10, 1993, letter was obtained after the lawyer-client relationship had ended, when

"people would come up to me and tell me that, hey, this Leon DeMendoza guy is doing this or doing that or he's done this to me."

However, the Bar's evidence demonstrated that the accused had represented DeMendoza since 1986 in several legal matters, the subjects of which directly correspond to the information about DeMendoza revealed in the December 10, 1993, letter, including a seizure of firearms by federal agents, a personal-injury matter during which DeMendoza supposedly forged the name of the accused on a settlement check,[6] and the Wilderness Ranch sale. The letter recites detailed facts about each of those matters. We are satisfied that the accused acquired at least the foregoing information that he

---

[6] In connection with that matter, the accused argues that he did not learn of DeMendoza's forgery from DeMendoza himself, but from another lawyer with whom the accused was working at the time. However, as this court noted in *State v. Keenan / Waller*, 307 Or 515, 519, 771 P2d 244 (1989), DR 4-101(A) "does not confine the client's 'secrets' to communications; indeed, they may reach the attorney from someone other than the client."

disclosed during his lawyer-client relationship with DeMendoza, rather than, as the accused claims, after that relationship had ended and through casual conversations with other unidentified persons.

DR 4-101(A) also requires that, for information to be "secret," *either* the client must request that the information be held inviolate *or* the disclosure of the information must be embarrassing or likely to be detrimental to the client. We focus here on the second of those alternatives. Each of the statements in the letter on which the Bar relies disclosed arguably criminal or fraudulent actions by DeMendoza. The nature of the disclosures, the overall tone of the letter, and the circumstances surrounding its preparation lead us to conclude that the accused's purpose in sending the letter, at least in part, was to embarrass DeMendoza and to portray him as a criminal or a cheat in order to induce Gilstrap to question DeMendoza's character and to refrain from pursuing DeMendoza's claims. We find that the disclosures were both embarrassing and likely to be detrimental to DeMendoza. The fact that the accused made the disclosures to De-Mendoza's new lawyer does not alter the embarrassing and detrimental character of the disclosures.

We reject the accused's contention that his conduct falls under the exception in DR 4-101(C)(4). That exception is limited, by its terms, to disclosures that are *necessary* to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client. The accused already had established his claims against DeMendoza, and there was no pending action against the accused by DeMendoza that required the accused to assert a defense. The disclosures were not required for the assertion of the accused's legal claims that his judgments against DeMendoza were valid. The accused's letter was little more than a veiled attempt to intimidate DeMendoza and Gilstrap in order to deter them from challenging the accused's judgments. The accused was not entitled to reveal DeMendoza's secrets under DR 4-101(C)(4). Accordingly, we find the accused guilty of the third cause of complaint.

In regard to the first cause of complaint, the Bar contends that the accused pursued unwarranted claims and

engaged in other harassing actions, in violation of DR 7-102(A)(1) and (2), and engaged in conduct prejudicial to the administration of justice, in violation of DR 1-102(A)(4), by pursuing his claim for legal fees against DeMendoza after the debt had been discharged in bankruptcy.[7] The accused responds that he did not know about the bankruptcy proceeding until November 1993, and so his conduct before that time cannot form the basis for any of the ethical violations charged in the first cause of complaint. The accused also contends that his actions legally were warranted and that his actions did not violate any disciplinary rule.

The trial panel concluded that the Bar had failed to meet its burden of proof on the first cause of complaint:

"Although there are suspicious circumstances, there is no clear and convincing evidence that the Accused had actual knowledge of Client's bankruptcy until the Accused was notified by the District Attorney in July, 1993. This was after the Accused had taken the judgments. If the · Accused had acted like most attorneys testified was normal attorney action after receiving the bankruptcy notice, and had cooperated in setting aside or voiding the judgments in light of the bankruptcy order, there would have been no ethical violation. The question, as seen by the Trial Panel, is whether the Accused's decision to oppose the setting aside of the judgments was a violation of DR 7-102(A)(2) (knowingly advance a claim that is unwarranted) and DR 1-102(A)(4) (engage in conduct that is prejudicial to the administration of justice). George Kelly, a University of Oregon professor, and the only person the Trial Panel considered a bankruptcy expert, testified that the Accused's action at the trial court level in opposing the setting aside of the judgments and pursuing [a] collection action against the property or against the co-defendant was a legitimate position to advance. Furthermore, neither the Oregon

---

[7] At oral argument, the Bar contended that there was another "level" to its first cause of complaint, namely, that the fraud, conversion, and fraudulent-transfer claims that the accused asserted against DeMendoza were legally and factually unsupported for reasons other than the existence of the bankruptcy proceeding. The Bar did not allege that charge in the complaint or make that argument in its brief. We decline to consider an argument raised to us for the first time at oral argument. *See* ORS 9.529 (disciplinary proceedings are within this court's inherent power to control); *In re Thomas*, 294 Or 505, 526, 659 P2d 960 (1983) (declining to consider particular violations because "those questions were not briefed or argued").

Court of Appeals nor the Oregon Supreme Court imposed any sanctions on the Accused for pursuing the appeal. Although the Accused's actions in response to actual notice of the bankruptcy are unusual and inconsistent with what every other non-expert practicing lawyer who testified would have done, the Trial Panel finds no violation of DR 7-102(A)(1)[, DR 7-102(A)](2) or DR 1-102(A)(4) when the Accused resisted setting aside the judgments and pursued the matter through attorney, George Kelly, on appeal."

The "suspicious circumstances" to which the trial panel referred are those surrounding the question whether the accused first received notice of DeMendoza's bankruptcy after he had obtained judgments against DeMendoza. We have examined in detail the ample and conflicting evidence on that issue and are satisfied that a point-by-point recital of that evidence would not benefit the bar or the public. As did the trial panel, we conclude that the Bar has failed to carry its burden to prove that the accused had notice of DeMendoza's bankruptcy when he secured judgments against DeMendoza.

The Bar also contends that, in defending the accused's judgments against DeMendoza *after* receiving notice of the bankruptcy, the accused violated DR 7-102(A)(1) and (2) and DR 1-102(A)(4).[8] According to the Bar, the

---

[8] DR 7-102(A)(1) provides:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the lawyer's client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another."

DR 7-102(A)(2) provides:

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"(2) Knowingly advance a claim or defense that is unwarranted under existing law except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law."

DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to:

"* * * * *

"(4) Engage in conduct that is prejudicial to the administration of justice[.]"

accused ethically could not defend his judgments against DeMendoza, even if he obtained the judgments without notice of a bankruptcy, because the effect of a bankruptcy discharge is to "void[ ] all past and future judgments against the bankrupt debtor on currently existing debts and also permanently enjoin[ ] creditors from pursuing the debtor." In support of that argument, the Bar cites 11 USC section 524(a):

"(a)  A [bankruptcy] discharge in a case under this title—

"(1)  voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged * * *;

"(2)  operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor * * *[.]""

The accused contends that there was a good faith reason, well grounded in law, for him to pursue his claims and to defend the resulting judgments in spite of the bankruptcy discharge. He bases that argument in part on the brief filed by his lawyer, Kelly, on his behalf in *Huffman v. Leon De Mendoza*, 135 Or App 680, 899 P2d 734 (1995), *rev den* 322 Or 489 (1996). Kelly testified for the accused before the trial panel and explained the accused's legal argument. According to Kelly, a bankruptcy discharge does not eliminate debts but, rather, enjoins creditors from pursuing any actions to recover debts "as a personal liability of the debtor." 11 USC § 524(a)(2). He further noted that, under 11 USC section 524(e), "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, the debt." *See also Matter of Edgeworth*, 993 F2d 51, 53 (5th Cir 1993) (bankruptcy discharge "does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt").

According to the accused, his fraudulent-transfer claim was permissible under 11 USC section 524(e), because, in that action, the accused was seeking to recover the debt from someone other than the debtor, namely, Javier. The accused contends that ORS 95.270(2) allows him to seek a

judgment against Javier for fraudulent transfer. That statute provides, in part:

> "* * * [T]o the extent a transfer is voidable in an action by a creditor * * *, the creditor may recover judgment for the value of the asset transferred * * *. The judgment may be entered against:
>
> "(a) The first transferee of the asset or the person for whose benefit the transfer was made[.]"

The accused further argues that his action for fraud, conversion, and breach of contract was legally supported because it was necessary to facilitate his fraudulent transfer action against Javier.[9] *See In re Jet Florida Systems, Inc.*, 883 F2d 970, 973 (11th Cir 1989) (quoting 3 R. Babitt, et al, *Collier on Bankruptcy*, ¶ 524.01 at 524-16 (15th ed 1987)):

> " 'When it is necessary to commence or continue a suit against a debtor in order, for example, to establish liability of another, perhaps a surety, such suit would not be barred. Section 524(e) was intended for the benefit of the debtor but was not meant to affect the liability of third parties or to prevent establishing such liability through whatever means required.' "

*See also In re Gary W. Beeney*, 142 Bank Rep 360 (9th Cir 1992) (allowing creditor to pursue claim against discharged debtor solely to determine debtor's liability so that creditor could collect damages from debtor's insurer).

■ A lawyer violates DR 7-102(A)(2) when the lawyer "[k]nowingly advance[s] a claim * * * that is unwarranted under existing law except that the lawyer may advance such claim * * * if it can be supported by good faith argument for an extension, modification or reversal of existing law." We need not decide whether the accused would have prevailed on

---

[9] In that litigation, the Court of Appeals stated that the accused "concedes that the judgments against [DeMendoza] are void due to the discharge in bankruptcy." *Huffman*, 135 Or App at 684. That characterization is too broad. The accused, in his brief in *Huffman*, stated: "Under the bankruptcy laws, the judgment against [DeMendoza]—*to the extent that its goal was to personally burden him with a liability*—was void." (Emphasis added.) The accused added the following footnote to his brief that clarified that he did not concede that the judgments against DeMendoza were void for all purposes: "[T]he judgment against [DeMendoza]—*to the extent its goal was to facilitate the action against Javier and Javier's property*— was also valid." (Emphasis added.)

his claims, but only whether the claims were warranted by existing law or supported by a good faith argument to extend, modify, or reverse existing law.

The arguments that the accused offers to buttress his claims are supported by the case law that he cites. The proposition that a creditor may pursue a debt incurred by a discharged debtor by filing a claim against another party who may be liable for that debt is well accepted bankruptcy law. *Edgeworth*, 993 F2d at 53-55; *Beeney*, 142 Bank Rep at 362. Bankruptcy law also appears to contemplate claims against the discharged debtor, if establishing a claim against the third party requires establishing the liability of the discharged debtor, as long as the claimant does not attempt to collect from the discharged debtor. *Jet Florida Systems, Inc.*, 883 F2d at 973; *Beeney*, 142 Bank Rep at 363. We conclude that the claims of the accused were either well grounded in law or in good faith arguments to extend, modify, or reverse the law. By advancing those claims, the accused did not violate DR 7-102(A)(2).[10]

We also conclude that, in pursuing his claims against DeMendoza and Javier and in defending the resulting judgments, the accused did not violate DR 7-102(A)(1). Those actions did not "serve merely to harass or maliciously injure" DeMendoza and Javier, in violation of that rule, because defendant had a valid claim for legal fees and because a colorable legal argument supported pursuing the claims despite the bankruptcy discharge. Accordingly, we cannot say that the actions of the accused were undertaken solely to harass or maliciously injure DeMendoza or Javier. *See In re Hockett*, 303 Or 150, 160, 734 P2d 877 (1987) (where conduct did harass and injure parties, but that was not lawyer's sole aim, DR 7-102(A)(1) not violated).

---

[10] At oral argument before this court, the parties debated the effect of the accused's failure first to approach the bankruptcy court to challenge the discharge or otherwise receive permission to pursue his claims in state court. Although we need not address an issue raised to us for the first time at oral argument, we again observe that, under 11 USC section 524(a), a discharge enjoins only those actions in which a creditor seeks to recover on a debt "as a personal liability of the debtor." Because an action in which a creditor seeks recovery from a third party does not violate 11 USC section 425(a), at least one court has held that a creditor need not approach the bankruptcy court before pursuing such a claim. *In re Beeney*, 142 Bank Rep 360, 363-64 (9th Cir 1992).

■ Finally, we conclude that, in pursuing his claims against DeMendoza and Javier, the accused did not engage in conduct prejudicial to the administration of justice in violation of DR 1-102(A)(4). The first step in assessing a DR 1-102(A)(4) claim is to determine "whether [the] accused lawyer engaged in 'conduct,' by doing something that the lawyer should not have done or by failing to do something that the lawyer was supposed to do." *In re Gustafson*, 327 Or 636, 643, 968 P2d 367 (1998). Here, the Bar has failed to prove that, when he pursued his claims against DeMendoza and Javier, the accused did something that he should not have done. Accordingly, the accused did not violate DR 1-102(A)(4) by pursuing those claims.

■ Having determined that the Bar proved that the accused violated DR 7-105(A) and DR 4-101(B), we turn to the question of the appropriate sanction. This court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for lawyer misconduct. *In re Schaffner*, 323 Or 472, 478, 918 P2d 803 (1996). We agree with the statement in the ABA Standards that:

> "The purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession."

ABA Standard 1.1. We similarly have noted that

> "[p]roceedings for the discipline of an attorney are not to punish the attorney for the commission of a crime. That matter is left to the criminal courts. The objects of the proceedings here are to uphold the dignity and respect of the profession, protect the courts, preserve the administration of justice and protect clients."

*In re Carstens*, 297 Or 155, 166, 683 P2d 992 (1984).

The ABA Standards set out an analytical framework for determining the appropriate sanction in lawyer disciplinary cases, using three factors: (1) the duty violated; (2) the accused lawyer's mental state; and (3) the actual or potential

injury caused by the accused lawyer's misconduct. ABA Standard 3.0. This court examines each of those three factors and makes an initial determination of the appropriate sanction. *See* ABA Standards at 5-6 (explaining analytical framework). If mitigating or aggravating circumstances are present, then the court considers those as a fourth factor and determines whether the sanction should be increased or decreased. *Id.* at 6; ABA Standard 3.0. In determining the correct sanction, the court also examines the conduct of the accused in light of the court's prior case law. *In re Garvey*, 325 Or 34, 44, 932 P2d 549 (1997).

■■ A lawyer's most important ethical duties are those owed to a client. ABA Standards at 5. The accused violated his duty of loyalty to his client by revealing client secrets. ABA Standard 4.2. Lawyers also owe a duty to the legal system not to abuse legal processes. ABA Standards at 5. The accused violated that duty by threatening criminal charges to obtain advantage in a civil matter. *See* ABA Standards at 5, 40; ABA Standard 6.2. *See also Lewelling*, 296 Or at 707 (when a lawyer threatens criminal charges solely to obtain advantage in a civil matter, "[i]t is an intimidating tactic that is an abuse of our legal processes").

The ABA Standards provide that a lawyer acts with "intent" if he or she has a "conscious objective or purpose to accomplish a particular result." ABA Standards at 7. We find that the accused intentionally revealed client secrets and threatened criminal charges to obtain advantage in a civil matter.

"Injury" includes actual or potential harm to a client, the public, the legal system, or the legal profession. ABA Standards at 6-7. The accused caused potentially serious harm to DeMendoza, exposing him to embarrassment and possible criminal investigation and attempting to deter him from pursuing his position in the actions that the accused had filed. The accused also caused potential harm to the legal system, by attempting to interfere with the adjudicatory process when he improperly threatened DeMendoza with criminal charges.

Several ABA Standards address the appropriate sanction for the accused's conduct. ABA Standard 4.21 provides:

"Disbarment is generally appropriate when a lawyer, with the intent to benefit the lawyer or another, knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client."

The commentary explains:

"Disbarment is warranted in situations when a lawyer intentionally abuses the client's trust by using the professional relationship to gain information which benefits the lawyer or another, and which causes injury or potential injury to a client. Because the violation of a client's confidence poses such a serious threat to the lawyer-client relationship, disbarment should be imposed whenever the lawyer acts with the intent to benefit the lawyer or another. Neither a 'serious' injury nor a 'potentially serious' injury to a client need be proved; any injury to a client will be sufficient to impose disbarment."

ABA Standards at 28. ABA Standard 6.21 provides:

"Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding."

The commentary explains:

"Lawyers should be disbarred for intentionally misusing the judicial process to benefit the lawyer or another when the lawyer's conduct causes injury or potentially serious injury * * *. For example, in *In re Daniel Friedland*, 416 NE2d 433 (Ind 1981), the lawyer filed charges against members of the Disciplinary Committee and witnesses in the lawyer disciplinary hearing. The lawyer attempted to use the lawsuit to intimidate and discredit those who administered and prosecuted grievances against him. In holding that the lawyer was not protected by the First Amendment, the court recognized the harm to judicial integrity. '* * * The adjudicatory process cannot function when its officers misconstrue the purpose of litigation. The

respondent attempted to influence the process through the use of threats and intimidation against the participants involved. This type of conduct must be enjoined to preserve the integrity of the system. * * *' "

ABA Standards at 41.

Drawing together the factors of duty violated, mental state of the accused, and injury caused, we make an initial determination that disbarment is the appropriate sanction in this case. We now turn to the fourth factor in our analysis, aggravating and mitigating factors.

Several aggravating factors are present. The accused was motivated by self-interest. ABA Standard 9.22(b). The accused has refused to acknowledge that any of his conduct was wrongful. ABA Standard 9.22(g). The accused has substantial experience in the practice of law. ABA Standard 9.22(i). Only one mitigating factor is present: The accused has no prior disciplinary record. ABA Standard 9.32(a).

We next consider this court's prior case law. We find no cases in which a lawyer was disciplined for violation of DR 4-101(B). In *Lewelling*, 296 Or at 706, the accused lawyer violated DR 7-104(A)(1) (prohibiting contact with represented party) and DR 7-105(A). The court observed that the DR 7-104(A)(1) violation alone would have led only to a public reprimand. *Id.* at 707. Because of the serious nature of the DR 7-105(A) violations, however, the court imposed a 60-day suspension. *Ibid.* The court did not expressly take into consideration any aggravating or mitigating factors.

In *In re Brown*, 326 Or 582, 956 P2d 188 (1998), the accused lawyer violated DR 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 7-101(A)(3) (prohibiting intentional conduct causing prejudice to client in course of professional relationship), DR 5-104(A) (prohibiting business transaction with client having different interests), and DR 5-101(A)(1) (prohibiting accepting employment when lawyer's interests may impair professional judgment). With respect to the first two violations, this court found that the state of mind of the accused lawyer was intentional; with respect to the latter two, it was knowing. *Id.*

at 605. The court observed that, "whenever a lawyer intentionally abuses the lawyer-client relationship for his own benefit," disbarment is the appropriate sanction. *Id.* at 605-06. There were no mitigating factors; as aggravating factors, the court noted failure of the accused to acknowledge the wrongfulness of his conduct and prior discipline for similar violations. *Id.* at 606. The court disbarred the accused:

> "In view of the seriousness of the violations at issue in this case, the presence of aggravating factors, and the absence of any mitigating factors, we conclude that the appropriate remedy is disbarment."

*Ibid.*

This case warrants a more severe sanction than that in *Lewelling*, in which the party whom the accused lawyer had threatened with criminal charges was not his client. Further, in *Lewelling*, there were no aggravating factors—in particular, it appears that, in *Lewelling*, the accused lawyer was motivated to serve his client, and not by self-interest. This case is closer to *Brown* because, in both cases, the lawyer "intentionally abuse[d] the lawyer-client relationship for his own benefit." 326 Or at 605-06. *Brown* is distinguishable, however, because, in that case, the lawyer engaged in an extended course of conduct in which his interests were in conflict with those of his clients. In this case, by contrast, the accused committed only one act—writing the December 10, 1993, letter—that the Bar has proved violated two disciplinary rules. Furthermore, in *Brown*, the accused was found to have violated four disciplinary rules in the course of misleading clients over an extended period of time. The accused here violated two rules in a single transaction involving the breach of client secrets and a threat of prosecution. In *Brown*, no mitigating factors existed, while here, the accused has no prior disciplinary record.

Although the accused's violations stem from a single act, that act involved a serious breach of the duty of the accused to his client and to the legal system. The accused acted intentionally and was motivated by self-interest. He shows no appreciation of the wrongfulness of his acts. However, in light of our prior cases and of the absence of a prior disciplinary record, we determine that it is not appropriate to

disbar the accused. *See Schaffner*, 323 Or at 480 ("The miti-gating factors do not outweigh the aggravating factors, even though lack of a prior disciplinary record is a strong mitigating factor."). The Bar requests that the accused be suspended for two years. That sanction is in accord with our precedents. Accordingly, we conclude that the accused be suspended from the practice of law for a period of two years.

The accused shall be suspended from the practice of law for a period of two years, commencing 60 days from the filing of this decision.