Submitted on the record October 12, 1999, accused suspended for two years, with the period of suspension to run consecutively to the period of suspension imposed on the accused in *In re Huffman*, 328 Or 567, 983 P2d 534 (1999) October 26, 2000

# In re Complaint as to the Conduct of

## BRUCE E. HUFFMAN,
*Accused.*

## (OSB 95-228, 96-88; SC S43743)

13 P3d 994

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, a trial panel of the Disciplinary Board found that the accused violated DR 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation) by filing motions to waive or defer an appellate filing fee and the cost of preparing trial transcripts, and DR 1-103(C) by failing to respond fully and truthfully to inquiries from the Oregon State Bar (Bar). The trial panel imposed an 18-month suspension and required that the accused take and pass the professional responsibility portion of the bar examination before being reinstated to the practice of law.

*De novo* review by this court is automatic. ORS 9.536(2), (3). The Bar has the burden of establishing alleged misconduct by clear and convincing evidence. BR 5.2. We hold that the Bar has established that the accused violated DR 1-102(A)(3) and DR 1-103(C) and that the appropriate sanction for those violations is a two-year suspension. The suspension shall run consecutively to the two-year suspension imposed on the accused in *In re Huffman*, 328 Or 567, 983 P2d 534 (1999) (*Huffman I*).

The facts are not disputed. On October 26, 1994, the accused, on his own behalf, filed a notice of appeal from an adverse judgment in a civil action between the accused and a former client. *See Huffman v. Leon De Mendoza*, 135 Or App 680, 682-84, 899 P2d 734 (1995) (setting out facts of that action). The accused did not include the $100 filing fee with his notice of appeal. *See* ORS 21.010(1) (1993) (requiring $100 filing fee to initiate appellate review in Court of Appeals).[1] The State Court Administrator notified the accused that he either had to submit the filing fee or file a motion to waive or defer the filing fee under ORS 21.605 (1993).[2]

---

[1] Although subsequent legislation has modified ORS 21.010(1) (1993), we apply that statute because it was in effect when the accused acted.

[2] ORS 21.605 (1993) provided, in part:

"(1)(a) [T]he Chief Judge of the Court of Appeals * * * may waive in whole or in part, defer in whole or in part, or both, all fees and court costs payable by a party to a particular civil action or proceeding in the court of the justice or judge, upon application by the party, if the justice or judge finds that the party is then unable to pay all or any part of the fees and costs.

On May 26, 1995, the accused filed the following motion with the Court of Appeals:

> "Appellant moves the Court for an order pursuant to ORS 21.605 to waive or defer the filing fee in this case for the reason that Appellants [*sic*] business and income has dropped substantially this year from last year. Appellant is unable at this point to make his estimated tax payments from his business income as there is [*sic*] insufficient monies there."

On June 13, 1995, the accused filed a motion to waive or defer the costs of preparing the transcript, asserting the same grounds. The Court of Appeals denied both motions. The court provided the accused with an affidavit of indigency and allowed him additional time to submit it. He testified that he did not do so because, after reviewing the affidavit, he determined that he "was probably not going to come within the guidelines."

On June 19, 1995, approximately one week after the accused had filed his motion to waive or defer the costs of preparing the transcript, opposing counsel Gilstrap filed a complaint with the Bar alleging that the accused had misrepresented himself to the Court of Appeals as indigent or insolvent. On June 26, 1995, Assistant Disciplinary Counsel Hicks asked the accused to respond to the complaint and to include in his response information about his personal assets.

In his response to Hicks's inquiry, the accused stated that, when he filed the motions, he was "experiencing a cash flow problem." He provided no financial records. Over the next few months, Hicks requested the accused's financial records. On October 31, and again on December 4, 1995, Hicks asked the accused to provide her with the following:

---

"* * * * *

"(3)(a) If fees and court costs payable by a party to a civil action or proceeding have been waived or deferred under subsection (1) of this section, the [Chief Judge of the Court of Appeals] * * * may order that the expense of preparing the record and transcript on appeal be waived in whole or in part, deferred in whole or in part, or both."

"1.   the balance of all bank accounts in your name or to which you had access as of May 26, 1995 [the date of the accused's first motion].

"2.   all stocks, bonds, mutual funds, futures, money market accounts owned by you solely, jointly, or in any other form of ownership that gave you the right to transfer or use the proceeds from the sale of them.

"3.   any financial statements prepared or loan applications made between January 1, 1995 and May 26, 1995."

On December 15, 1995, the accused told Hicks that he would not disclose the requested personal financial documents because he believed that her request was "not reasonable or necessary." On January 22, 1996, the accused told Hicks that, because the *De Mendoza* case concerned a business matter, only his business assets were relevant to her inquiry.

On June 25, 1996, the Bar referred the matter to the Klamath/Lake County Local Professional Responsibility Committee (LPRC), which assigned Lakeview lawyer Bogardus to investigate. In a telephone interview in September 1996, Bogardus asked the accused to disclose both his business and personal assets as of the date on which he had filed his motions in the Court of Appeals. The accused replied that, at that time, he had approximately $1,400 in his business checking account, owned a business computer and office furniture, owned three parcels of land in Klamath County, and had an IRA account with a balance of approximately $100,000. The accused did not disclose to Bogardus that, at that time, he also had over $400,000 in a personal checking account and over $500,000 in personal investment accounts. The Bar discovered those additional assets at a later time.

The Bar's amended complaint asserted three causes of complaint.[3] As noted, the trial panel found that the accused violated DR 1-102(A)(3) and DR 1-103(C).

---

[3] The Bar's first cause of complaint alleged that the accused violated DR 1-102(A)(3), DR 7-102(A)(7), and ORS 9.527(4) by attempting to convert assets to his own use with the intent of defeating lien holders. The trial panel found in favor of the accused on that cause of complaint, and the Bar does not challenge that determination before this court.

As a threshold matter, the accused contends that the trial panel committed several procedural errors that prejudiced his ability to receive a fair trial. We have considered those procedural challenges and reject them without further discussion. We turn to the substance of the charged violations.

### DR 1-102(A)(3)

We first address the Bar's claim that, by filing the motions to waive or defer the appellate filing fee and transcript costs, the accused violated DR 1-102(A)(3). DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to

"* * * * *

"(3)  Engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

The Bar alleged that the motions were "false or misleading in one or more of the following particulars:"

"1.  The Accused's income and business had, in fact, not declined sufficiently in 1995 to render him unable to pay his filing fee, transcript preparation costs, or tax obligations;

"2.  The Accused, in fact, had sufficient funds in his business bank account to pay the filing fee;

"3.  The Accused, in fact, had sufficient personal assets and funds to pay the filing fee and transcript preparation costs; and

"4.  The Accused, in fact, had sufficient combined personal and business assets to meet his tax obligations."

The Bar also alleged that the "motions created the false impression that the Accused was indigent or unable to pay the Court of Appeals filing fee or the cost of preparing the transcript."

DR-102(A)(3) contains four different legal grounds on which a violation may be premised: dishonesty, fraud, deceit, and misrepresentation. The Bar's amended complaint

does not specify on which of those theories it intended to proceed. Before this court, both the accused and the Bar argue only the theory of misrepresentation. Accordingly, we analyze the Bar's allegations under that theory.

■ "Misrepresentation" may include an affirmative misstatement, an intentional failure to disclose material facts that may or may not have been intended to deceive, or a combination of both. *In re Hiller*, 298 Or 526, 532-33, 694 P2d 540 (1985); *see also In re Greene*, 290 Or 291, 298, 620 P2d 1379 (1980) (in concluding that lawyer's failure to advise court of necessary information may be misrepresentation, court stated that a "half-truth or silence can be as much a misrepresentation as a lie"). Improper motive is not necessary for a violation of DR 1-102(A)(3). *In re McKee*, 316 Or 114, 125, 849 P2d 509 (1993) ("A misrepresentation made with the best of intentions is nonetheless a misrepresentation."); *see also In re Boardman*, 312 Or 452, 456-57, 822 P2d 709 (1991) (in discussing misrepresentation charge, court stated that "the fact that the accused did not intend injury to any party [does not] preclude the finding of a disciplinary rule violation"); *Hiller*, 298 Or at 533 (difference between misrepresentation and fraud or deceit is that latter include intention that recipient act on misrepresentation without its being discovered). In the disciplinary context, reliance by the recipient of the misrepresentation is not a required element. *In re Benson*, 317 Or 164, 169, 854 P2d 466 (1993).

■ The Bar contends that, by filing the motions to waive or defer, the accused violated DR 1-102(A)(3). The Bar contends both that the motions contained at least one affirmative misstatement and that, by omitting material information from his motions, the accused committed misrepresentation by nondisclosure. We first address the alleged affirmative misstatement. The Bar asserts that the accused's income had not, as he claimed in his motions, "dropped substantially this year from last year." The Bar points to the tax returns for 1995, the year in which the motions were filed, and 1994. In 1995, the accused reported an adjusted gross income of $80,479, while in 1994, he reported an adjusted gross income of $82,671. The Bar contends the difference—$2,179—is anything but a "substantial drop."

The accused responds that his statement that his income had dropped substantially, comparing his financial situation at the time that he filed his motions to the prior year, was true. He observes that $21,000 of his 1995 income was attributable to sales of property that occurred in July 1995. Those sales, however, did not occur until after he filed his motions. The accused asserts that, when he compared his income at the time that he filed the motions, his income had dropped substantially.

■ When considering whether a lawyer has made an affirmative misstatement, our inquiry focuses on the truth or falsity of the facts asserted, not on whether those facts support a legal point. *Cf. Boardman*, 312 Or at 456 ("The fact that the accused believed that his representations stated the legally correct position is immaterial. * * * The point is that the accused knew that he was misrepresenting the facts as they existed at the time.").

In this proceeding, the Bar failed to prove, by clear and convincing evidence, that the accused made an affirmative misstatement when he claimed that his income had dropped substantially. The Bar gives no reason for comparing the adjusted gross income for 1994 and 1995, instead of his total income. As the accused used the unmodified term "income," it seems more appropriate to compare all his income in 1994—$103,720.67—to all his income in 1995—$89,125.20. The accused reasonably could characterize the difference between those two numbers—$14,595.47 or 14 percent—as a "substantial drop." Furthermore, the accused is correct that the court must judge the truth or falsity of his statements at the time that he made them. Nothing in the record suggests that the accused knew, when he filed his motions, that he would have income from property sales in the amount of $21,000 later in the year. Nor did the Bar introduce evidence about the accused's income at the time he filed his motions. Accordingly, we conclude that the Bar failed to carry its burden of proof with respect to the alleged affirmative misstatement.

■ The Bar further argues that the accused engaged in misrepresentation by nondisclosure. The Bar reasons as follows: To be entitled to waiver or deferral, a party must be

"unable to pay" the filing fee or transcript costs. ORS 21.605(1)(a); ORS 21.605(3)(a). According to the Bar, the accused knew that standard. The accused had ample resources with which to pay the filing fee and transcript costs for the appeal and, in fact, had a net worth of over $1 million. Nevertheless, the accused requested waiver or deferral of the filing fee and transcript costs. As the Bar puts it,

> "[t]he Accused knew that he was not entitled to a waiver or deferral, but nevertheless filed motions that were carefully worded to create the false impression that he was either indigent or unable to pay the $100 filing fee and trial transcript preparation costs. The language of these motions painted a picture of business reversals and reduction in personal income, a situation in which the Accused's liabilities exceeded his assets to such an extent that he could not even afford to pay his taxes. However, this picture was false[.]"

The accused does not dispute the trial panel's factual findings that he had ample assets with which to pay the filing fee and cost of preparing the transcript. He argues only that he did not intend to mislead the Court of Appeals when he filed his motions and that he thought that, to receive a deferral or waiver, he merely had to have experienced "some sort of economic setback."[4]

■    We conclude that the Bar proved, by clear and convincing evidence, that the accused engaged in misrepresentation by nondisclosure, in violation of DR 1-102(A)(3), when he filed the motions for waiver or deferral. We first observe that disposition of this portion of the DR 1-102(A)(3) charge depends largely on our assessment of the credibility of several witnesses, especially the accused and Gilstrap. In disposing of the first cause of complaint—a cause not before us on review—the trial panel expressly found the accused to be not credible, a determination that we read as applying to the accused's testimony generally, not just his testimony with respect to the first cause of complaint. Although we review the record *de novo* in discipline cases, we generally defer to the credibility determinations of a trial panel. *In re Martin*,

---

[4] The accused made the additional argument before the trial panel that he had not read either ORS 21.605, quoted above, or ORCP 17, which discusses the legal significance of a lawyer's signature on documents. He does not renew that argument here.

328 Or 177, 189, 970 P2d 638 (1998). The Bar called several lawyers in the Klamath Falls legal community who testified that the accused had a poor reputation for truth and veracity. In response, the accused called one nonlawyer witness, a former client, who testified that the accused was truthful, and a lawyer witness, who testified that the accused had a neutral reputation for truth and veracity. The accused suggested that Gilstrap was pursuing a vendetta against him and had a poor memory and, accordingly, was not credible. The trial panel, however, apparently accepted Gilstrap's testimony as credible, and so do we. Our own review of the record leads us to conclude that the accused was not credible.

■■ To establish misrepresentation by nondisclosure, the Bar must meet a high standard of proof: The Bar must establish that the accused lawyer knowingly failed to disclose a fact that the accused lawyer had in mind and knew to be material. *In re Gustafson*, 327 Or 636, 648-49, 968 P2d 367 (1998). "Material" facts are those that, "had [they] been known by the court or other decision-maker, would or could have influenced the decision-making process significantly." *Id.* at 649. In this case, the Bar contends that the accused knowingly failed to disclose aspects of his financial situation—particularly that he had over $400,000 in a checking account and that he had a net worth of over $1 million—and that he knew that those facts would or could have influenced the Court of Appeals' decision about whether he was entitled to a waiver or deferral of the appellate filing fee and transcript preparation costs.

The accused argues that the Bar's case must fail, because the Bar did not establish that he knew that those facts were material. The accused contends that he had a good faith, albeit mistaken, belief that the legal standard for the motions that he filed was that he had suffered "some sort of economic setback." He further contends that he subjectively believed that information about his personal assets was not material to whether he was entitled to waiver or deferral in a case in which he was not a party as an individual, but as a lawyer.

The accused does not argue that he did not have the facts of his financial status in mind or that those facts were

not material to the court's decision whether to waive or defer fees and costs. The arguments of the accused thus are relevant to only the narrow issue of his *knowledge* of the materiality of the facts. In essence, he contends that, if he in good faith believed that the facts that he omitted to mention were not material to the determination of his motions, he did not engage in misrepresentation by nondisclosure. We conclude, however, that the record disproves the predicate for that reasoning, *i.e.*, that the accused did not know that the information was material.

First, the record establishes that the accused knew that the standard for waiver or deferral of appellate filing fees and transcript preparation costs was not that the moving party has experienced "some kind of economic setback," but, instead, was "unable to pay." ORS 21.605(1)(a) (1993) (filing fees); ORS 21.605(3)(a) (1993) (transcript preparation costs; citing ORS 21.605(1)(a) (1993)). The accused testified that the only authority that he consulted before filing his motions was the letter that he received from the Appellate Records Section advising him that he needed either to submit the filing fee or to file a motion to waive or defer the fee. Although that letter cites ORS 21.605, the accused testified that he had not read ORS 21.605 before filing his motions. At least as to the motion to waive or defer transcript preparation costs, the testimony of the accused on that point is not credible.

The letter from the Records Section was a form letter that requested that the accused provide "[a] filing fee of $100 (ORS 21.010; ORS 21.605); or a motion for waiver or deferral of filing fees." The letter does not mention transcript preparation costs, let alone that a party may move to waive or defer those costs. ORS 21.605(3)(a) (1993) stated the procedure and standards for waiver or deferral of transcript preparation costs. The Bar argues, and we agree, that the only way that the accused—who testified that he never had handled an appeal previously—would have known to file a motion to waive or defer transcript preparation costs was if he had read ORS 21.605 (1993), which incorporated the "unable to pay" standard.

Moreover, we find convincing evidence that the accused had in mind information that he knew could have

affected the decision on his motions, based on testimony of Gilstrap, who had represented the defendants in the case in which the accused had filed the motions to waive or defer. Gilstrap testified as follows:

> "[The Bar:] Okay. And did you have any opportunity to talk with Mr. Huffman specifically about his filing of the motions requesting waiver and deferral of fees and [costs]?
>
> "[Gilstrap:] Only on one occasion.
>
> "[The Bar:] What did Mr. Huffman say to you when you talked to him about his filing that motion?
>
> "[Gilstrap]: Well, by the time I talked to him I knew that he was a person who had substantial assets. I didn't at that time know the extent to which his assets consisted. But I knew by then that he had substantial assets and I asked him, in fact we were walking down the street on our way over to this building and I asked him how a person with substantial assets could possibly attempt to get the Court of Appeals to waive a $100 filing fee and his response to me was that he hadn't really lied to the Court of Appeals, because what he had said in the motion had not been stated under oath. That if I would look carefully, I would see that there was not an affidavit, it was just a bare statement and that any person has the right to just go into the Court of Appeals and make a bare statement requesting that they waive fees. That was the extent of the conversation."

That testimony, which we credit, together with the evidence described above, clearly and convincingly demonstrates that the accused knew that information about his other assets might be relevant to consideration of his motions, but consciously decided to withhold the information. We conclude that the accused had in mind that his substantial assets could have influenced the decision on his motions.

Because the accused knowingly failed to disclose to the Court of Appeals facts that he knew could have affected the court's decisions on his motions, the accused engaged in misrepresentation by nondisclosure, in violation of DR 1-102(A)(3).

## DR 1-103(C)

■   We turn to the Bar's claim that the accused violated DR 1-103(C), which provides:

> "A lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from and comply with reasonable requests of a tribunal or other authority empowered to investigate or act upon the conduct of lawyers, subject only to the exercise of any applicable right or privilege."

In its third cause of complaint, the Bar alleged that the accused violated DR 1-103(C) by failing to respond fully and truthfully to Bogardus's inquiries regarding his assets when Bogardus interviewed the accused over the telephone in September 1996. In response to Bogardus's inquiries, the accused stated that he had only $1,400 in his business account, three parcels of land in Klamath County, and approximately $100,000 in a retirement account. As noted, at the time that Bogardus made his inquiry, the accused had more than $1 million in assets, several hundred thousand dollars of which were immediately available to him in checking accounts.

■   A lawyer who fails to respond fully and truthfully to an LPRC investigator violates DR 1-103(C). *In re Staar*, 324 Or 283, 290, 924 P2d 308 (1996). Providing an incomplete response to a request for information during a disciplinary investigation violates DR 1-103(C). *In re Morin*, 319 Or 547, 557, 878 P2d 393 (1994).

The accused contends that he did not fail to cooperate with Bogardus. He contends that, during the telephone interview, he expressed to Bogardus his position that personal assets were not relevant to the possible violations being investigated. According to the accused, Bogardus did not express disagreement with that position to the accused or inform the accused that he still wanted the information. Because the accused claims that he had reason to believe that Bogardus was satisfied with his response, the accused argues that he did not fail to cooperate with the Bar.

In recounting those events, the accused testified as follows:

"[Bogardus] called me * * * and asked me questions about the investigation, the motion, the assets, that kind of thing. And I told him what my business assets were. And then he was asking me some things about like real property so I told him some things. And then he started inquiring into other things like, any stocks, bonds, and that kind of thing. And I said, 'Well I don't think that's relevant,' because the motion dealt with business income and that's business assets and that kind of thing and I didn't think it was relevant. * * * He, after I made that comment he just dropped it. That was the end of it. So I assumed he was satisfied. He never relayed to me that he wanted me to reveal other personal assets after that."

The testimony of the accused on those matters generally is consistent with what Bogardus remembered about the interview. On direct examination by the Bar, Bogardus testified that the accused did disclose some personal assets, namely real property and a retirement account. Bogardus then testified, "I think I asked him if he had any other asset at that time and he indicated to me that he did not."

The record establishes, without material contradiction, that the accused objected to Bogardus's request that the accused disclose both personal and business income information because, according to the accused, that information was not relevant to the question whether he had been honest in seeking waiver of the filing fee and transcript preparation costs from the Court of Appeals. The record also establishes that Bogardus acquiesced in the accused's objection. Because Bogardus failed to press his request for information despite the accused's objection, the accused had no notice that Bogardus regarded the accused's relevancy objection and accompanying explanation to be an insufficient response.

That is not the end of the matter, however. If the accused had confined his response to a simple nondisclosure of information about his personal assets, consistent with his objection, the record would not support a conclusion that the accused had failed to cooperate with Bogardus. However, the accused did not simply object and decline to disclose information about his personal assets. Instead, the accused told Bogardus that he had some real estate and approximately $100,000 in a retirement account, and said that he had no

other assets. The accused failed to tell Bogardus that he in fact had more than $1 million in personal assets and that he had immediate access to several hundred thousand dollars of those assets in a checking account. Under the circumstances, the representations that the accused did make to Bogardus about his personal assets were incomplete and false. We conclude that the Bar proved that the accused failed to cooperate with a disciplinary investigation in violation of DR 1-103(C).

## SANCTION

■ Having determined that the accused violated DR 1-102(A)(3) and DR 1-103(C), we turn to the question of the appropriate sanction. As noted, the trial panel suspended the accused from the practice of law for a period of 18 months. In light of this court's subsequent decision in *Huffman I*, 328 Or 567, the Bar contends that the appropriate sanction here is disbarment. The accused asserts that, if the court disagrees with his arguments that no disciplinary violations occurred, then a reprimand or a suspension of up to 90 days is the appropriate sanction.

■ This court refers to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for lawyer misconduct. *In re Schaffner*, 323 Or 472, 478, 918 P2d 803 (1996). According to ABA Standards 1.1,

> "[t]he purpose of lawyer discipline proceedings is to protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to discharge their professional duties to clients, to the public, the legal system, and the legal profession."

This court first considers three factors in determining the appropriate sanction: the duty violated, the accused lawyer's mental state, and the actual or potential injury caused by the accused lawyer's misconduct. ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. *In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999); ABA Standard 3.0. Finally, we look to Oregon case law. *Devers*, 328 Or at 241.

In this case, the accused violated his duty to the public to maintain his standards of personal integrity (ABA Standard 5.0), his duty to the legal system to refrain from conduct involving misrepresentation (ABA Standard 6.0), and his duty as a professional to cooperate completely and truthfully with a disciplinary investigation (ABA Standard 7.0).

As to the accused's mental state, the Bar contends that he acted intentionally, because he acted with a "conscious objective or purpose to accomplish a particular result," namely, to deceive the Court of Appeals and to obtain a benefit to which he knew he was not entitled. ABA Standards at 7. The accused responds that he was at most "ignorant," as he never before had filed motions to waive or defer an appellate filing fee or transcript costs. He further contends that his decision not to continue to pursue his motions after receiving the form affidavit of indigency is inconsistent with an intent to deceive.

In filing his motions, the accused clearly acted with the intent to achieve a particular result, *i.e.*, to avoid paying filing fees and transcript costs. Under the definition in the ABA Standards, the conduct of the accused in misrepresenting material facts to the Court of Appeals was "intentional." The accused also acted intentionally in making inaccurate and misleading statements about the extent of his personal assets during the disciplinary investigation. The accused's argument that some of his actions were inconsistent with an intent to deceive misses the mark. For conduct to be "intentional" under the ABA Standards definition, the lawyer need not have acted with a *bad* state of mind, but only with a state of mind to achieve a particular result. ABA Standards at 7.

We turn to whether the accused's conduct caused injury. "Injury" includes actual or potential harm to a client, the public, the legal system, or the legal profession. ABA Standards at 6-7. The Bar contends that the accused's conduct had the potential to injure indigent litigants by reducing the limited funds set aside by the State Court Administrator for access by those litigants to the legal system. The Bar also contends that the accused's conduct in misrepresenting his assets created the possibility of misleading the Bar. The

accused responds that there was no actual injury here, because he decided not to pursue his motions once he received the form affidavit of indigency and disclosed that he did have substantial personal assets, even if that disclosure understated his assets.

■    We conclude that the accused's conduct in misrepresenting facts in his motions caused the potential injuries to the legal system that the Bar cites. The accused's motions also caused both the Court of Appeals and the State Court Administrator to engage in needless work in responding to them. To function fairly and efficiently, courts must be completely confident in the trustworthiness of lawyers who appear before them. *Greene*, 290 Or at 297. The accused violated that expectation here. In effect, the accused attempted to use misrepresentation to obtain $100, in addition to the amount of the transcript preparation costs, from the budget of the State of Oregon. The accused did mitigate the extent of the potential injury to some degree by choosing promptly not to pursue the motions after receiving the affidavit of indigency.

The accused's failure to cooperate with the disciplinary investigation also caused both actual and potential injury to the legal system. A disciplinary investigation is a key component of the regulatory system that undergirds the disciplinary rules. Lawyers must provide a prompt and fully accurate response, without reservation, to factual inquiries submitted by those who investigate ethical complaints on behalf of the Bar and the LPRC. The accused's noncooperation, in the form of a material understatement of his personal assets, distorted the Bar's information regarding the accused's personal assets and threatened to undermine the Bar's investigation. The accused did mitigate the extent of that injury by acknowledging to Bogardus that he did possess substantial personal assets consisting of real estate and a retirement account in the amount of $100,000. That disclosure was sufficient to permit the Bar to complete its investigation of the accused's conduct, despite the accused's understatement of his personal assets.

The accused's misconduct implicates several ABA Standards. ABA Standard 5.11 provides, in part:

"Disbarment is generally appropriate when:

"\* \* \* \* \*

"(b) a lawyer engages in \* \* \* intentional conduct involving \* \* \* misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

ABA Standard 5.13 provides:

"Reprimand is generally appropriate when a lawyer knowingly engages in any other [noncriminal] conduct that involves dishonesty, fraud, deceit or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."

ABA Standard 6.11 provides:

"Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding."

ABA Standard 6.12 provides:

"Suspension is generally appropriate when a lawyer knows that \* \* \* information is improperly being withheld, and takes no remedial action, and \* \* \* causes an adverse or potentially adverse effect on the legal proceeding."

ABA Standard 7.1 provides:

"Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer \* \* \* and causes serious or potentially serious injury to a client, the public, or the legal system."

ABA Standard 7.2 provides:

"Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system."

The ABA Standards do not indicate clearly that disbarment is the appropriate sanction for the accused's misconduct. However, the ABA Standards, in our view, do indicate

clearly that the accused's misconduct merits a significant suspension. We adopt a suspension as our initial determination of the appropriate sanction in this case.

We turn to a consideration of aggravating and mitigating factors. There are no mitigating factors. However, we find several aggravating factors. The accused acted with a dishonest and selfish motive, ABA Standard 9.22(b); he engaged in a pattern of misconduct, ABA Standard 9.22(c); he violated multiple disciplinary rules, ABA Standard 9.22(d); he engaged in deceptive practices during the disciplinary process, ABA Standard 9.22(f); he refuses to acknowledge the wrongful nature of his conduct, ABA Standard 9.22(g); and he has substantial experience (18 years) in the practice of law, ABA Standard, 9.22(i).

Finally, the accused has committed prior disciplinary offenses for which he was suspended from the practice of law for two years. ABA Standard 9.22(a). *See Huffman I,* 328 Or 567 (prior disciplinary proceeding). As this court explained in *In re Jones,* 326 Or 195, 200, 951 P2d 149 (1997), "offenses that have been adjudicated prior to imposition of the sanction in the current case" are aggravating factors.[5]

Prior offenses receive a varying amount of weight as aggravation, depending on several factors. *See id.* (setting out nonexhaustive list of factors). The relative timing of the current offense in relation to the prior offense is a pertinent factor here. As explained in *Jones,* especially important is "whether the accused lawyer had been sanctioned for the prior offense before engaging in the offense in the case at bar." *Id.*; *see also In re Wyllie,* 327 Or 175, 183, 957 P2d 1222 (1998) (that this court's decision in earlier case was rendered after second case had been concluded at trial panel level and briefed to this court diminished significance of prior discipline as aggravating factor); *In re Starr,* 326 Or 328, 347, 952 P2d 1017 (1998) (that events giving rise to prior discipline occurred at roughly same time as events giving rise to second proceedings somewhat diminished weight of prior discipline

---

[5] As this court observed in *In re Cohen,* 330 Or 489, 499 n 7 (2000), use of the term "adjudicated" in this context is not strictly accurate, because letters of admonition, although not "adjudicated," may be considered as part of the "prior record" of an accused lawyer.

as aggravating factor, because accused lawyer's acts in second proceeding did not reflect disregard of an earlier adverse ethical determination). In this case, as in *Wyllie*, this court rendered its decision in *Huffman I* after the parties had concluded the present proceeding at the trial panel level and had briefed this case on appeal to this court. Those events took place long after the accused committed the misconduct at issue in this proceeding. As a result, those facts diminish the weight of the accused's prior offense as an aggravating factor in this proceeding.

A second pertinent factor is the similarity of the misconduct at issue to the misconduct at issue in the prior proceeding. *Jones*, 326 Or at 200. In *Huffman I*, the accused violated DR 7-105(A) (prohibiting threatening to press criminal charges to obtain advantage in a civil matter) and DR 4-101(B) (prohibiting knowingly revealing or misusing client secrets). The dissimilarity between the misconduct in the two proceedings further diminishes the weight that we place on the prior misconduct of the accused as an aggravating factor.

A third pertinent factor is the relative seriousness of the prior offenses and resulting sanction. *Jones*, 326 Or at 200. The offenses and sanction in the prior proceeding involving the accused were at least moderately serious. Overall, we give some, but not substantial, weight to the accused's prior misconduct in determining the appropriate sanction.

We next consider this court's case law. The sanctions that this court has imposed in cases involving violations of DR 1-102(A)(3) range from a reprimand, *see Boardman*, 312 Or at 458 (knowing mental state, potential injury, no aggravating factors, mitigating factors of lack of prior disciplinary record and lack of selfish motive), to disbarment, *see Devers*, 328 Or at 245 (multiple violations of several rules, intentional mental state, potential serious injury, multiple aggravating factors, including several prior instances of discipline, and several mitigating factors); *In re Hawkins*, 305 Or 319, 327, 751 P2d 780 (1988) (intentional mental state, substantial actual injury to client and legal system, several aggravating factors, single mitigating factor of absence of prior disciplinary record).

We have found several cases in which the accused lawyers made misrepresentations to a court or to Bar investigators, and otherwise refused to cooperate with a Bar investigation. In *Wyllie*, the accused lawyer made misrepresentations, including a false statement under oath, regarding his participation in continuing legal education activities, and made additional misstatements of fact to an LPRC investigator who was investigating the matter. This court concluded that the accused lawyer had acted intentionally, that he had caused harm by needlessly triggering a time-consuming Bar investigation into the truth of his statements, and that several aggravating factors, but no mitigating factors, were present. *Wyllie*, 327 Or at 182-83. The facts in *Wyllie* are analogous to the facts presented here. This court in *Wyllie* imposed a two-year suspension and required the suspension to run consecutively to the suspension that the accused lawyer already was serving as the result of an earlier disciplinary proceeding. *Id.* at 184. *See also Staar*, 324 Or at 290-93 (imposing two-year suspension for knowing false statement to court under oath and repeated failure by accused lawyer to respond to inquiries by Bar and LPRC; mitigating factors of absence of prior discipline and mental disability or impairment); *In re Brown*, 298 Or 285, 297, 692 P2d 107 (1984) (imposing two-year suspension for improperly advancing money to client; faced with Bar complaint, accused lawyer created false evidence by obtaining client's affidavit denying advancement of money).

In cases like this one, in which the Bar commenced proceedings by formal complaint after December 31, 1995, a suspension may range from 30 days to five years. BR 6.1(a)(iv). This court views a lawyer's intentional misrepresentation to a court as serious misconduct, *In re Page*, 326 Or 572, 580, 955 P2d 239 (1998), because courts must be able to rely on the candor, honesty, and integrity of the lawyers who appear before them. *Greene*, 290 Or at 297; *see also Staar*, 324 Or at 290-91 (stating that duty to refrain from intentionally misleading court is one of the highest duties a lawyer owes to the legal system). Consistent with the case law summarized above, we conclude that the accused's conduct warrants a two-year suspension from the practice of law. We also conclude, as this court determined in *Wyllie*, that the accused

should serve the period of that suspension consecutively to the suspension that he presently is serving.

The accused is suspended for two years, with the period of suspension to run consecutively to the period of suspension imposed on the accused in *In re Huffman*, 328 Or 567, 983 P2d 534 (1999).